883 A.2d 479

**COMMONWEALTH of Pennsylvania, Appellee/Cross–Appellant,**

v.

**Eric J. MAGLIOCCO, Appellant/Cross–Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 21, 2003.

Decided Sept. 28, 2005.

Ellen T. Greenlee, Karl Baker, Peter Rosalsky, Philadelphia, for Eric J. Magliocco.

Hugh J. Burns, Philadelphia, Jason Fetterman, for Com.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## *OPINION*

Justice CASTILLE.

This Court granted review in these cross-appeals to address two separate issues of statutory interpretation: (1) whether under the relevant statutory definition of an instrument of crime, a conviction for Possession of an Instrument of Crime ("PIC"), 18 Pa.C.S. § 907, requires proof that the instrument (here, a baseball bat) is "commonly" used for criminal purposes; and (2) whether a conviction for Ethnic Intimidation, 18 Pa.C.S. § 2710, may be sustained in an instance where the defendant has been charged with, but acquitted of, the predicate crime which is an element of the offense. The trial court,

sitting without a jury, convicted appellant/cross-appellee Eric J. Magliocco of both PIC and ethnic intimidation. The Superior Court affirmed the PIC conviction, but reversed the ethnic intimidation conviction. *Commonwealth v. Magliocco*, 806 A.2d 1280 (Pa.Super.2002). For the reasons set forth below, we affirm the Superior Court on both issues.

On July 7, 1999, Magliocco was on the front steps of his house in Philadelphia, when ten-year-old Fatima Smith, riding her bicycle, and her fifteen-year-old cousin Tamara, on foot, passed Magliocco's house. Both girls are African–American. Magliocco, who is Caucasian, shouted profanity and racial epithets at the two girls, then entered his house and returned with a baseball bat. As he walked out onto the pavement in front of his steps, swinging the bat, Magliocco continued to yell racial slurs and other vulgar language at the two girls, saying he was going to make sure there were no more "niggers" living on his block. Tamara, who lived on the block, ran into her house and called the police. Soon thereafter, Officers Damon Evans and Michael Coston of the Philadelphia Police Department arrived, saw Magliocco on his front steps, and heard him saying he was "going to kill every nigger on the block." Officer Evans told Magliocco to drop the bat; Magliocco responded, "I'm not going to talk to you, nigger." Magliocco eventually threw the bat down and the officers placed him under arrest. N.T. 2/2/2000, 19–34. Magliocco was charged with PIC, ethnic intimidation, and Terroristic Threats, 18 Pa.C.S. § 2706.

On February 2, 2000, Magliocco was tried without a jury before the Honorable Joan A. Brown of the Court of Common Pleas of Philadelphia County. Fatima Smith and Officers Evans and Coston testified on behalf of the Commonwealth to the basic facts as set forth above. The defense called two character witnesses. The trial court found Magliocco guilty of PIC and ethnic intimidation, but acquitted him of terroristic threats. The court later sentenced Magliocco to a two-year term of probation with the condition that he attend mental health counseling.

■ On appeal, a panel of the Superior Court affirmed the PIC conviction but vacated the ethnic intimidation conviction. This Court granted the parties' cross-petitions for allowance of appeal: Magliocco's to challenge the affirmance of his PIC conviction, and the Commonwealth's to challenge the reversal of the ethnic intimidation conviction. Each question poses an issue of statutory construction, a question of law as to which this Court's review is plenary and non-deferential. *See, e.g. Department of Trans. v. Taylor*, 576 Pa. 622, 841 A.2d 108 (2004).

## I. *MAGLIOCCO'S APPEAL: PIC CONVICTION*

■ Magliocco's challenge to his PIC conviction is based upon the interplay of successive amendments to the PIC statute. A person is guilty of PIC if he "possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a).[1] Prior to 1995, the "definitions" subsection of the PIC statute (which was found in then-subsection (c)) defined an "instrument of crime" as: "(1) anything specially made or specially adapted for criminal use; or (2) anything commonly used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." In 1995, this Court considered the issue of whether a baseball bat, not specially made or adapted for criminal use, could be deemed "commonly used" for criminal purposes such that it could qualify as an instrument of crime under the second cited definition. *See Commonwealth v. Ngow*, 539 Pa. 294, 652 A.2d 305 (1995). The *Ngow* Court held that the Commonwealth must present evidence of the proportionality of the criminal use of baseball bats in order to prove common use, rather than, for example, relying upon anecdotal evidence or newspaper articles detailing attacks with baseball bats. Because the record in *Ngow* lacked such empirical evidence, this Court vacated Ngow's PIC conviction. In a concurring opinion, this author noted that the General Assembly was free to address the apparent inequity uncovered in *Ngow*—*i.e.*, that attacks with a baseball bat, as opposed to

1. Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, effective June 6, 1973.

attacks with a firearm or other deadly instrument, are not necessarily subject to separate punishment—by amending subsection 907(c) to eliminate the word "commonly" from the second definition of an instrument of crime. *Id.* at 307 (Castille, J., concurring).

Six months later, in July of 1995, and in apparent response to the *Ngow* decision, the General Assembly amended the PIC statute to delete the word "commonly" from subsection 907(c)'s second definition of an "instrument of crime." *See* Act of July 6, 1995, P.L. 238, No. 27, § 1 (effective 60 days after date of enactment) ("Act 27"). Act 27 specifically identified itself as amendatory, *i.e.*, "Amending Title 18 (Crimes and Offenses) of the Pennsylvania Consolidated Statutes, further providing for the offense of possessing instruments of crime...." Session Laws of Pennsylvania, Session of 1995, p. 238. Act 27 was printed in accordance with 1 Pa.C.S. § 1104 (governing Adoption and Publication of Constitutional and Statutory Provisions) ("Section 1104"), which provides that when such amendatory statutes are printed, provisions which have been stricken or eliminated by the amendment are to be placed in brackets, while new words, phrases or provisions inserted into the statute by the amendment are to be printed in italics or with underscoring.[2] Thus, the single change to

2. Section 1104 reads as follows:

**§ 1104. Printing of Amendatory Statutes.**

**(a) General rule.**-The Director of the Legislative Reference Bureau shall, in printing amendatory statutes, cause to be printed the section or part of the statute only as reenacted. Except as provided in subsection (b) of this section, in the section or part of the law reenacted, the Director shall cause to be printed between brackets, the words, phrases, or provisions of the existing statute, if any, which have been stricken out or eliminated by the adoption of the amendment, and he shall cause to be printed in italics or with underscoring all new words, phrases or provisions, if any, which have been inserted into or added to the statute by the passage of such amendment.

**(b) Consolidated Pennsylvania Statutes.**-In printing as much of any statute as adds an entire title, part, article, chapter, subchapter or other major subdivision to the Consolidated Pennsylvania Statutes, the Director shall cause such addition to be printed in Roman type without underscoring, and in printing as much of any statute as deletes or repeals an entire title, part, article, chapter, subchapter or other major subdivision of the Consolidated Pennsylvania Statutes,

the PIC statute was indicated in the printing of Act 27 by placing the word "commonly" in brackets (and boldface). Section 1951 of the Statutory Construction Act, 1 Pa.C.S. § 1501 *et seq.* ("the Act"), entitled "[i]nterpretation of amendatory statutes," corroborates how such an amendment is to be read: "In ascertaining the correct reading, status and interpretation of an amendatory statute, the matter inserted within brackets shall be omitted, and the matter in italics or underscored shall be read and interpreted as part of the statute." *Id.* § 1951.

A year later, in July of 1996, the General Assembly revisited and again amended the PIC statute. *See* Act of July 11, 1996, P.L. 552, No. 98, § 1 (effective 60 days after date of enactment) ("Act 98"). Act 98, like Act 27, specifically identified itself as amendatory, *i.e.*, in pertinent part, "Amending Title 18 (Crimes and Offenses) of the Pennsylvania Consolidated Statutes, further providing for the offense of possessing instruments of crime...." Session Laws of Pennsylvania, Session of 1996, p. 552. Act 98 added a totally new subsection 907(c), criminalizing the possession of body armor in the course of committing, or attempting to commit, a felony. Act 98 also redesignated the definitional section (former subsection(c)) as subsection (d); added a definition of "body armor;" and raised the first letter of the word "anything" in the definitional section from lower to upper case. Consistently with Section 1104 and the Act, each of the additions/alterations in the printed 1996 amendment was indicated by italics (as well as by boldface), while the deletions were bracketed.

The Act 98 amendment, however, appears to have referred to the version of Section 907 which pre-dated the 1995 amendment: *i.e.*, it included the later-stricken word "commonly" in the second definition of an instrument of crime, but did so in plain typeface, without any editing marks (brackets or italics) indicating either the 1995 deletion or an intent in 1996 to readopt the "commonly" used requirement. Nor was the word typed in boldface, as is generally indicated to make it

the Director shall not cause to be printed the provisions which have been deleted or repealed unless the deletion or repeal was effected by the use of brackets.

easier to locate changes to the statute. The unacknowledged reappearance of the word "commonly" in the 1996 amendment, an amendment which served primarily to criminalize the possession of body armor, has generated the instant controversy.

Magliocco concedes that the PIC statute was amended by Act 27 of 1995 to eliminate the "commonly" used requirement from the second definition of an instrument of crime, but he contends that the definitional qualifier must be deemed to have been restored as part of the body armor amendment added by Act 98 of 1996. Magliocco argues that a person who consulted the "official source material" for legislation (*i.e.,* the Session Laws printed by the Legislative Reference Bureau) would be led to believe that the word "commonly" was reinserted as part of the second definition of an instrument of crime. Because the Commonwealth did not offer empirical proof of the commonality of the criminal use of baseball bats at trial, as required by the *Ngow* Court's interpretation of the former "commonly used" definition, Magliocco argues that the evidence was insufficient to sustain his PIC conviction.

Magliocco argues in the alternative that, even if the reappearance of the word "commonly" in the 1996 PIC amendment was in error, that qualifier still must be deemed an element of the crime under the second definition because, otherwise, the statute would violate due process by failing to provide fair notice of the conduct deemed criminal. In Magliocco's view, the PIC statute must be construed to avoid such a notice violation, and therefore, common use must again be deemed an element of PIC under the second definition. Magliocco further argues that, although most of the decided cases addressing fair warning arise from vague or overbroad statutes, the same principle is implicated when a statute is narrow and precise, but when a court interprets the statute to mean something different from what is suggested by a literal reading of its terms.

The Commonwealth responds that, while the word "commonly" does appear in the text of the Act 98 amendment of the PIC statute as printed by the Legislative Reference Service in the 1996 Session Laws, the word was neither

italicized nor underscored, and thus, under Section 1951 of the Statutory Construction Act, it cannot be deemed a substantive part of Section 907 of the Crimes Code. The Commonwealth notes that both the Act 27 amendment and the Act 98 amendment occurred during a relatively short period of time, and thus, it is unremarkable that the 1996 amendment worked off the earlier unamended version of Section 907 containing a word which was stricken by the 1995 PIC amendment. In support of its argument concerning the proper reading of Section 907 as amended, the Commonwealth also invokes Section 1954 of the Act, entitled "merger of subsequent amendments," which specifically contemplates and governs circumstances involving multiple amendments to a statute:

Whenever a statute has been more than once amended, the latest amendment shall be read into the original statute as previously amended and not into such statute as originally enacted. This rule applies whether or not the previous amendment is referred to and whether or not its language is incorporated in the latest amendment. If the insertions in and the deletions from the statute made by the previous amendment are not incorporated in the latter, they shall nevertheless be read into the later amendment as though they had in fact been incorporated therein.

1 Pa.C.S. § 1954. The Commonwealth submits that Sections 1951 and 1954 of the Act exist for the very purpose of avoiding interpretive disputes such as the one that Magliocco pursues here, where two separate amendments follow closely upon one another. The Commonwealth further argues that one need only properly read the 1996 amendment pursuant to the specific and unambiguous principles of construction set forth in the Act to realize that the word "commonly" was not reinserted into the second definition of an instrument of crime in the PIC statute.

With respect to Magliocco's due process argument, the Commonwealth argues that any person reading an act of amendment, which the 1996 Act clearly was, must be presumed to be capable of reading it properly. The Commonwealth notes that Magliocco relies on Volume 1 of the 1996

edition of the Session Laws of Pennsylvania as proof that the word "commonly" was legislatively readopted as part of the second definition of an instrument of crime, but fails to acknowledge that, in the very same volume, Section 1951 of the Act is quoted, thereby specifically reminding readers of the proper manner by which to construe amendatory statutes. Furthermore, the Commonwealth notes that the preface of every edition of the Pennsylvania Session Laws as well as Purdon's Pennsylvania Legislative Service (a commonly-used secondary source for legislation) clearly explains that only properly highlighted terms in the collected Acts actually alter existing legislation. Consultation of the original statute and prior amendments, thus, is contemplated and that consultation clearly reveals the current content of a statute.

The trial court held that Section 1954 controlled. The court recognized that the 1996 amendment, which criminalized the possession of body armor, worked off of a version of the PIC statute that did not include the 1995 deletion of the word commonly. In such an instance, the trial court reasoned, Section 1954's directive that the previous deletion "be read into the later amendment as though [it] had in fact been incorporated therein" answered the interpretive question. Op. at 256, 883 A.2d at 486.

The Superior Court panel majority affirmed. The panel majority recognized that Section 1104(a), and Section 1951 of the Statutory Construction Act,[3] prescribe a mandatory process for printing new language or deleting existing language from a statute, and provide instructions on how to give effect to such an amendment. The panel held that the Act did not empower it to accept as controlling any portion of an amendatory statute that was not printed in the designated manner. Because the word "commonly," which was deleted in 1995, did not appear italicized or underscored in the 1996 amendment, the panel concluded that it could not accept Magliocco's con-

3. The Superior Court was under the incorrect assumption that Section 1104 was a part of the Statutory Construction Act. Section 1104 is part of a provision governing publication of statutory provisions, setting forth the duties of the Director of the Legislative Reference Bureau.

tention that the 1996 amendment restored the common use requirement to the second definition.

The panel majority also relied upon Section 1954, which it understood to be a legislative recognition that errors in printing could frustrate accurate expressions of legislative acts and the legislative will. Indeed, the panel majority recognized that if the General Assembly did not intend Section 1954 to apply in a case such as this, then this provision of the Act would serve no purpose. The panel found that the reading plainly mandated by Section 1954 required it to recognize the 1995 deletion of the word "commonly" as having been incorporated into the 1996 amendment. Thus, the panel held that the 1996 amendment did not reintroduce a common use element into the second definition of an instrument of crime; rather, the appearance of the word "commonly" in the 1996 amendment was a legal nullity. Accordingly, the panel majority found that Magliocco's conviction for PIC was proper. 806 A.2d at 1284–85.

President Judge Emeritus McEwen filed a concurring and dissenting opinion, his disagreement being confined to the PIC conviction. P.J.E. McEwen conceded that what he deemed to be the panel majority's "corrective construction" might be effective in the context of a civil statute but, in his view, it could not withstand constitutional scrutiny in the criminal context because legislative enactments must give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.

Because the 1996 amendment effected by Act 98, as printed, included the word "commonly" which had specifically been deleted by the General Assembly in the 1995 amendment, but without any new editorial notation indicating addition or deletion, Section 907 is properly subject to rules of statutory construction. *E.g. Walker v. Eleby*, 577 Pa. 104, 842 A.2d 389, 400 (2004) (statutory construction is appropriate where language of statute is ambiguous concerning point in dispute); 1 Pa.C.S.1921(c). Here, the issue of legislative intent—which is not answerable by simply reading Section 907 as printed in the 1996 amendment—is whether the General Assembly in-

tended to reintroduce the "commonly" used requirement into the second definition of an instrument of crime. As the lower courts both properly recognized, that question of legislative intent is specifically answered by those provisions of the Statutory Construction Act which address the proper construction of amendatory statutes. Those provisions, in conjunction with Section 1104, make clear that a "commonly" used requirement was not legislatively reintroduced.

Under Section 1951 of the Act, because the word "commonly" does not appear italicized or underscored in the 1996 amendment, Section 907 cannot be read and interpreted as though the General Assembly intended to readopt a "commonly" used requirement. Moreover, Section 1954 of the Act specifically addresses the circumstance of successive amendments to a statute, and its provisions are clear, unambiguous, on point, and dispositive of the issue as a statutory construction matter. Section 907(d) is to be read by including **both** the 1995 deletion of the word "commonly" in the second definition and the 1996 additions of the provisions respecting body armor. That reading is legislatively commanded irrespective of "whether or not the previous amendment is referred to and whether or not its language is incorporated in the latest amendment"—the precise circumstance which is presented in the case *sub judice*. The statutory change effected by the 1995 amendment (a single deletion) is to be deemed "as though [it] had in fact been incorporated therein" into the 1996 amendment. 1 Pa.C.S. § 1954.

Thus, as a matter of statutory construction, ascertaining legislative intent respecting the content of Section 907 is discernable. Section 1954 reflects the General Assembly's recognition, based no doubt on hard-earned experience, that inadvertent or careless errors in the drafting or publication of legislative acts may frustrate the accurate communication of legislative action and will. Not to give effect to the clear statutory interpretive directive in those circumstances for which it was intended would defeat the legislative will. Read consistently with the directive in Section 1954, Section 907(d)

plainly does not contain a "commonly" used requirement in its second definition of the term, "instrument of crime." [4]

■■■■ We next turn to Magliocco's alternative argument that a construction of the second definition of an instrument of crime as not including a "commonly" used requirement violates due process because it would operate to deprive him of fair notice of the conduct Section 907 made criminal.[5] The U.S. Supreme Court has recognized that due process requires a criminal statute to give fair warning of the conduct it criminalizes. *Rogers v. Tennessee,* 532 U.S. 451, 457, 121 S.Ct. 1693, 1698, 149 L.Ed.2d 697 (2001); *United States v. Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). A lack of fair warning can result from vague statutory language or, less commonly, from an unforeseeable judicial interpretation of statutory language that appeared to be facially narrow and precise. *Bouie v. City of Columbia,* 378 U.S. 347, 352, 84

---

4. Magliocco argues that in *Appeal of Loushay,* 370 Pa. 453, 88 A.2d 793 (1952), and *United States Steel Co. v. Allegheny County,* 369 Pa. 423, 86 A.2d 838 (1952), this Court found that a statute's second amendment, which included but did not underscore or italicize language deleted by a prior amendment, had the effect of reinserting the original language into the statute. The Commonwealth responds that both of these cases were decided two decades before the enactment of Sections 1951 and 1954 of the Statutory Construction Act, which specifically address the manner in which amendatory statutes are to be construed. The Commonwealth's distinction is persuasive.

In any event, the cases are readily distinguishable. *U.S. Steel* involved two legislative acts (not amendments), one passed by the House and one passed by the Senate, which, we noted, were "absolutely conflicting and irreconcilable." 86 A.2d at 840. The Governor signed one bill expressly authorizing a certain practice, and then three days later signed the other bill, expressly abolishing the very same practice. In *Loushay,* the General Assembly passed two separate and irreconcilable amendments to the same statute, nine days apart, neither mentioning the other, with both set to take effect on the same day. In both *U.S. Steel* and *Loushay,* this Court was charged with determining which action reflected the General Assembly's true intent, and in both cases we held that the latter-in-time statute controlled. These situations are starkly different from the sort of drafting or printing mishap presented here, a circumstance which is specifically addressed by the subsequently-enacted Statutory Construction Act.

5. Magliocco's due process claim was not addressed by the trial court or the Superior Court panel majority, although it was addressed in P.J.E. McEwen's *concurring and dissenting opinion.*

S.Ct. 1697, 1701–02, 12 L.Ed.2d 894 (1964); *accord Rogers, supra.* In the latter situation, due process prohibits the retroactive application of any judicial construction of a criminal statute that is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue. *Bouie,* 378 U.S. at 354–55, 84 S.Ct. at 1703; *accord Rogers,* 532 U.S. at 455–60, 121 S.Ct. at 1697–99. Retroactive application of a court's construction of a criminal statute may be deemed infirm not only where the construction is at odds with the statute's plain language, but also where it lacks any support in prior case law. *Bouie,* 378 U.S. at 356, 84 S.Ct. at 1704. In short, notions of due process may bar courts from applying a novel construction of a criminal statute to certain conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. *United States v. Lanier,* 520 U.S. 259, 266–67, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997); *Rogers, supra.* The touchstone in this analysis is whether the statute, standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal. *Lanier,* 520 U.S. at 267, 117 S.Ct. at 1225.

■ This case involves neither vague statutory language nor a judicial construction which deviates from clear statutory language or a prior interpretation of the same language, so as to alter expectations concerning the scope of the conduct deemed criminal. Indeed, the dispute does not concern interpretation of the statutory language, but instead the specific language actually enacted by the General Assembly. This Court's determination of what the statute says—specifically, whether the word commonly is a part of it—is commanded by specific provisions of the Statutory Construction Act. That determination effectuates the plain language of the statute as actually enacted and amended, and there is nothing vague or uncertain in the meaning of the PIC statute's definition of an instrument of crime, once so apprehended. Instead, the due process challenge here only arises from the adequacy of the method of memorializing and conveying legislative intent in the case of successive amendments to a statute. While the

proper analysis of that conveyance of legislative intent requires consultation of other legislative provisions which specifically address the successive amendment scenario and make the statutory construction answer clear, we do not believe that such a construct violates due process.

To pass due process muster, criminal legislation need not be so simple as to be reducible to sound bites, or subject to communication and conveyance by word of mouth. The very notion of a fair notice requirement presupposes a reasonably intelligent citizen who, if interested, is capable of educating himself concerning the status of the law. So long as courts presume that putative criminal defendants consult (or could consult) the session laws to apprise themselves of what conduct is prohibited before they act, it is no great or onerous additional step to indulge the concomitant assumption that they read those session laws according to legislatively-prescribed principles of construction. In this regard, it is notable that the Statutory Construction Act's interpretive provisions are not aimed exclusively at courts, or lawyers, or legislative specialists; rather, the Assembly broadly mandated that, "[i]n the construction of the statutes of this Commonwealth, the rules set forth in this chapter shall be observed, unless the application of such rules would result in a construction inconsistent with the manifest intent of the General Assembly." 1 Pa.C.S. § 1901. The provisions governing amendatory statutes are set forth plainly, and in the instance implicated in this case, clearly answer the interpretive question.

In forwarding an argument premised upon the inclusion of the word "commonly" in the printing of the 1996 Amendment to Section 907, Magliocco invokes the official source of Pennsylvania legislation, *i.e.*, the "Laws of the General Assembly" which are printed after each year's legislative session by the Director of the Legislative Reference Bureau. *See* 1 Pa.C.S. § 503 (recognizing Bureau's publication as "legal evidence" of laws contained therein). However, any reader who sought to ascertain the status of the PIC statute following the 1996 amendment, and who thereby consulted Volume I of the 1996 Laws of the General Assembly, would see that Section 1951 of

the Statutory Construction Act is quoted, and instructs the reader how to read statutory amendments. Additionally, the preface of every edition of these Session Laws (as well as Purdon's Pennsylvania Legislative Service, the unofficial source of Pennsylvania legislation), clearly explains that only the highlighted terms in amendatory acts actually change the words of the existing statute. Such principles of construction, then, are a part of any construction of the printed session laws.

The Act at issue here, Act 98 of 1996, specifically identifies itself as an amendatory Act: it states at the outset that it is "Amending Title 18 (Crimes and Offenses) of the Pennsylvania Consolidated Statutes, further providing for the offense of possessing instruments of crime. . . ." Within the amendatory act, several sections are printed in boldfaced italics, indicating additions, while others are boldfaced and bracketed, indicating deletions. There is no suggestion that this printing was intended to reflect the definitive, self-contained, current statement of Section 907 as it existed following the 1996 amendment. Rather, Act 98 was explicitly designated as amendatory, purporting to highlight additions and deletions to Section 907 as it previously existed. Consultation with the pre-existing statute, thus, is presupposed, and it is no more difficult to find the prior version of the statute, and the rules of construction, than it is to find the amendment. No legal system dependent upon the salutary assumption that persons know the law could persist absent a concomitant assumption that those who are inclined to find the law are capable of doing so according to general, easily found, and clear principles of construction. Accordingly, we conclude that this Court's construction of Section 907, which is commanded by Section 1954 of the Statutory Construction Act, does not violate due process, and that construction makes clear that the word "commonly" is not a part of the second definition of an instrument of crime.[6] The Superior Court properly affirmed Magliocco's PIC conviction.

---

**6.** It is also worth noting that, to the extent Magliocco's due process argument depends upon the notion that he is entitled to rely upon the

## II. THE COMMONWEALTH'S APPEAL: ETHNIC IN-TIMIDATION CONVICTION

At the time relevant here, the Crimes Code provided that a person is guilty of ethnic intimidation "if, with malicious intention toward the race ... of another individual or group of individuals, he commits an offense under any other provision of this article or under Chapter 33 ... or under section 3503 ... or under section 5504 ... with respect to such individual ... or with respect to one or more members of such a group." 18 Pa.C.S. § 2710(a).[7] It is undisputed that the only potentially applicable predicate offense at issue in this case was Terroristic Threats, 18 Pa.C.S. § 2706.[8] The trial judge, however, acquitted Magliocco of that offense, and that acquittal formed the basis for his appellate challenge to the ethnic intimidation conviction before the Superior Court.

Magliocco argued that the evidence was insufficient to prove ethnic intimidation because the Commonwealth failed to establish that he committed terroristic threats. Magliocco maintained that a conviction—or at the very least a formal finding by the trier of fact that a defendant "committed" the predicate offense by proof beyond a reasonable doubt, even if not

statute as it literally appeared in Act 98, without consultation with other sources, it is somewhat disingenuous. The version of Section 907 at issue in *Ngow* did not include a definition of the term "commonly used," much less did the statute explicitly require empirical evidence to prove that factor. Instead, the requirement of empirical evidence emerged from the *Ngow* opinion's interpretation of the effect of the commonly used requirement. The practical consequence of the General Assembly's subsequent deletion of the word "commonly" could be appreciated only by one who was familiar with *Ngow*. Thus, appellant's argument that the 1996 Amendment misled citizens as to the statutory elements assumes that citizens may be deemed familiar not only with statutory language, but also with interpretive case law-a level of legal sophistication arguably greater than the ability to properly read successive amendatory statutes properly.

7. Amendments to the ethnic intimidation statute made since 1999 change the language, but do not affect the issue presented here.

8. Section 2710 is found in Article B of the Crimes Code, which governs "Offenses Involving Danger to the Person," and encompasses Chapters 23 through 32. Thus, terroristic threats is a qualifying Article B offense.

convicted of it—is a necessary element to support a conviction for ethnic intimidation.

In vacating the ethnic intimidation conviction, the Superior Court panel relied upon *Commonwealth v. Caine*, 453 Pa.Super. 235, 683 A.2d 890 (1996) (*en banc*) (conviction for homicide by vehicle while driving under the influence ("DUI") vacated where statute required "conviction" for DUI and defendant was acquitted of DUI), for the proposition that the evidence is insufficient to support a conviction if the conviction of a predicate crime is a required element of the offense but is not obtained. The panel recognized that the statute in the case *sub judice* required only the commission, and not the conviction, of the predicate offense. However, the panel opined that conviction of the predicate offense was required in order to properly classify and grade the offense of ethnic intimidation under Section 2710(b), which provides as follows:

> An offense under this section shall be classified as a misdemeanor of the third degree if the other offense is classified as a summary offense. Otherwise, an offense under this section shall be classified one degree higher in the classification specified in section 106 (relating to classes of offenses) than the classification of the other offense.

*Id.* In the panel's view, if the defendant has been acquitted of the underlying offense, the crime of ethic intimidation "logically cannot be graded." 806 A.2d at 1286–87.

The Commonwealth now argues that the Superior Court misapprehended the plain language of the statute by reading the statutory phrase "commits an offense" as if it read "is convicted of an offense." The Commonwealth submits that, in Pennsylvania law, the term "convicted" has a distinct meaning, *i.e.,* " 'the ascertainment of the guilt of the accused and judgment thereon by the court,' implying not only a verdict but a judgment of sentence thereon." Commonwealth's Brief, 10–12 (quoting *Commonwealth v. Kimmel*, 523 Pa. 107, 565 A.2d 426, 428 (1989)). Moreover, the Commonwealth notes that other provisions in the Crimes Code recognize this distinction. Thus, Section 306 of the Crimes Code, which addresses accomplice liability, includes subsection (g), which

governs the "prosecution of [an] accomplice only," and provides that: "An accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense has not been prosecuted or convicted or has been convicted of a different offense or degree of offense or has an immunity to prosecution or conviction or has been acquitted." 18 Pa.C.S. § 306(g). The Commonwealth submits that, by not adverting to the term of art "conviction" in Section 2710's reference to the predicate offense, but instead addressing the mere "commission" of a qualifying offense, the General Assembly clearly and unambiguously revealed its intention not to require a conviction of that predicate offense.

The Commonwealth further argues that the evidence it produced-that Magliocco threatened to kill the children and all other people of their race on the block, while brandishing a baseball bat-was sufficient to prove that he in fact committed terroristic threats, even though the bench trial judge specifically acquitted him of that crime. The Commonwealth maintains that, since an ethnic intimidation conviction requires a finding that the underlying offense was committed, the trial judge's guilty verdict on ethnic intimidation must be construed as representing a finding that Magliocco **committed** terroristic threats, even though she declined to **convict** him of it as a separate crime. Any inconsistency in the trial court's verdicts, the Commonwealth argues, is no basis for awarding relief upon a sufficiency of the evidence claim since consistency in verdicts is not required and an acquittal " 'cannot be interpreted as a specific finding in relation to some of the evidence.' " Commonwealth's Brief, 9–10, (quoting *Commonwealth v. Campbell,* 539 Pa. 212, 651 A.2d 1096, 1100 (1994)).[9]

9. In forwarding its argument respecting the proper way to view the trial court's verdict, the Commonwealth speaks in terms of the broad legal principles governing a reviewing court's function, *i.e.,* the way in which the verdict must be construed, rather than looking to evidence of what the verdict in fact may have reflected. Magliocco accepts the Commonwealth's review paradigm and likewise poses his argument in terms of how this Court should construe the verdict as a matter of law. We note, however, that the record suggests that it was not so clear to the trial judge or the lawyers who tried the matter that terroristic

Magliocco responds that the Superior Court correctly ruled that an offender cannot be deemed to have "committed" a predicate offense if he was both charged with, and actually acquitted of, that very offense at trial. Magliocco acknowledges that the term "commit" can have a different meaning than the term "convict" in some instances, but argues that the ethnic intimidation statute does not logically allow for a conclusion that a defendant has "committed" an offense for which he has just been acquitted. Magliocco further argues that a case such as this cannot be construed as posing a typical

threats were the basis for the ethnic intimidation conviction. At the conclusion of Magliocco's trial, the prosecutor and the trial court engaged in the following exchange:

> [Prosecutor]: ... Clearly we made out ethnic intimidation. Clearly, I believe beyond a reasonable doubt we made out the charge of PIC and terroristic threats which are the underlying charges we must make out for you to find this defendant guilty of ethnic intimidation....
>
> The Court: Mr. Magliocco, having heard the testimony presented in your case today I find you guilty of ethnic intimidation and possession of an instrument of crime. I find you not guilty of terroristic threats.

N.T. 2/2/2000, 75–76. At the sentencing hearing, the following discussion took place:

> The Court: Is there anything you want to say on behalf of your client?
>
> [Defense Counsel]: Yes, I do. Can I just put the [sentencing] guidelines on the record?
>
> The Court: That's fine.
>
> [Defense]: The offense gravity score is a five.
>
> [The Prosecutor]: Yes.
>
> [Defense Counsel]: Offense gravity score on ethnic intimidation is always one higher than the other crime, the conviction. **The conviction here is PIC, which is a four, so it goes up to a five. For ethnic intimidation you add one.**
>
> [The Prosecutor]: Agreed.

N.T. 4/14/2000, 4–5 (emphasis supplied). The trial court did not dispute or correct this characterization.

It thus appears that all those concerned believed that the PIC charge could properly serve as the underlying offense for the ethnic intimidation conviction. The parties now recognize that, since PIC is not one of the offenses or class of offenses enumerated as a predicate offense in Section 2710, it cannot serve as the predicate offense for ethnic intimidation. Notwithstanding what the record reveals, we recognize that the question now presented is not whether this Court can or should look behind the court's verdict as entered, but rather, it is the legal question of the effect of the terroristic threats acquittal upon the validity of the ethnic intimidation conviction.

instance of inconsistent verdicts. This is so because, *inter alia*, the qualifying offense (here, terroristic threats) is actually incorporated into the ethnic intimidation statute as an element of the crime; accordingly, proof was required not simply that the offense of terroristic threats was committed, but that that offense was committed beyond a reasonable doubt. The trial court's specific verdict of acquittal on that very question, Magliocco argues, necessarily precludes a finding that the Commonwealth sustained its burden respecting that element of the crime of ethnic intimidation.[10]

■■ We agree with the Commonwealth that it was not required to secure a formal conviction for the predicate crime of terroristic threats in order to secure a conviction for ethnic intimidation based upon such terroristic threats. Indeed, as we read the statute, the Commonwealth need not formally charge the defendant with the predicate offense, as long as it makes clear which offense it is pursuing as the predicate

**10.** The Commonwealth also disputes the Superior Court's reliance upon the problem of classifying and grading an offense where there has been an acquittal. The Commonwealth argues that the ethnic intimidation provision, like the Crimes Code generally, does not require a conviction in order to classify and grade an offense but merely looks to, *inter alia*, what penalty would be permissible **if there were** a conviction. Because the trial court's verdict must be construed as including a finding that Magliocco committed terroristic threats, the Commonwealth submits, proper grading in this instance was not impeded.

Magliocco responds, in part, with a hypothetical, suggesting a case where a defendant is charged with ethnic intimidation and two separate underlying felony offenses with different grading classifications, and is convicted of ethnic intimidation, but is acquitted of the underlying felonies. Magliocco argues that the sentencing court in such an instance could not accurately grade the ethnic intimidation offense unless it purported to determine for itself which of the underlying offenses was "committed"-a determination which would violate the right-to-jury-trial principles animating the U.S. Supreme Court's recent jurisprudence in the line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

The Commonwealth responds that, in the hypothetical situation posed by Magliocco, if the sentencing court could not determine which of two possible underlying offenses the defendant committed, it would simply grade ethnic intimidation based on the lesser of the two predicate offenses charged. Given this Court's disposition, we need not address, and we offer no opinion on, the classification/grading argument deemed persuasive by the Superior Court.

offense for purposes of the ethnic intimidation charge, and the factfinder is so made aware and, in the case of a jury, so charged. We also agree with the Commonwealth that a mere facial inconsistency in verdicts is not a valid basis upon which to upset a conviction which is otherwise proper, since consistency in verdicts is not required. *See, e.g., Commonwealth v. Carter*, 444 Pa. 405, 282 A.2d 375, 376 (1971) (consistency in criminal verdicts is unnecessary).[11]

■ Our difficulty with the Commonwealth's position arises from the necessary effect of an actual acquittal of a crime in the admittedly unusual circumstance presented here, where that crime is both separately charged and prosecuted and is also a specific statutory element of another charged offense. Acquittals, of course, have been accorded a special weight in the law. *United States v. DiFrancesco*, 449 U.S. 117, 129–30, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980) ("The law 'attaches particular significance to an acquittal.' ") (citation omitted); *Commonwealth v. D.M.*, 548 Pa. 131, 695 A.2d 770, 772 (1997). Thus, in *D.M.*, this Court stated:

A defendant enters a trial cloaked in the presumption of innocence and when the fact-finder reaches a verdict of acquittal, there is no justification to search for reasons to undermine the verdict. Such a defendant has achieved the strongest vindication possible under our criminal tradition, laws, and procedures[.]

*Id.* at 772–73. *Accord DiFrancesco*, 449 U.S. at 130, 101 S.Ct. at 433 (" 'We necessarily afford absolute finality to a jury's verdict of acquittal-no matter how erroneous its decision.' ") (citation omitted).

11. There can be no doubt that, since the ethnic intimidation statute incorporates the predicate offense as an element, the verdicts in this case are inconsistent. To convict a defendant of terroristic threats, the factfinder must conclude, beyond a reasonable doubt, that he "committed" that offense, as it is defined in 18 Pa.C.S. § 2706. A factfinder cannot logically conclude that a defendant "committed" the offense of terroristic threats for purposes of that element of ethnic intimidation, but did not "commit" the offense for purposes of the terroristic threats charge itself.

To secure a conviction for any crime, the Commonwealth must prove all necessary elements beyond a reasonable doubt. *E.g. Commonwealth v. Cosnek,* 575 Pa. 411, 836 A.2d 871, 874 (2003). In order to find Magliocco guilty of ethnic intimidation in this case, the factfinder had to conclude beyond a reasonable doubt that, among other things, he actually "committed" the offense of terroristic threats. But, the Commonwealth did not merely allege that, for purposes of an ethnic intimidation prosecution, Magliocco committed terroristic threats with a malicious racial animus. Instead, the predicate offense was actually charged and actually prosecuted, and that prosecution resulted in an acquittal-a finding that, for whatever reason, the Commonwealth failed to prove beyond a reasonable doubt that the defendant "committed" terroristic threats. Given the special weight afforded acquittals, since the factfinder in this case specifically found that Magliocco did not commit the offense of terroristic threats, the conviction for ethnic intimidation, which requires as an element the commission beyond a reasonable doubt of the underlying offense, simply cannot stand. Accordingly, we affirm the Superior Court's vacatur of Magliocco's conviction for ethnic intimidation.

For the foregoing reasons, we hold that the Superior Court correctly upheld Magliocco's conviction for PIC, and correctly reversed his conviction for ethnic intimidation. Accordingly, the order of the Superior Court is affirmed.

Former Justice LAMB did not participate in the decision of this case.

Chief Justice CAPPY files a concurring opinion.

Justice SAYLOR files a concurring and dissenting opinion.

## CONCURRING OPINION

Chief Justice CAPPY.

I join the majority opinion. I write separately to distinguish this case from one in which a citizen *in fact* relies upon

an erroneously printed criminal statutory enactment. Such a case, in my view, may implicate different legal concerns than those present in this appeal. *See, e.g.,* John T. Parry, *Culpability, Mistake, and Official Interpretations of Law,* 25 AM. J.CRIM. L. 1 (Fall 1997); Joseph E. Murphy, *The Duty of the Government to Make the Law Known,* 51 FORDHAM L.REV. 255 (1982); Comment: *People v. Marrero and Mistake of Law,* 54 BROOKLYN L.REV. 229 (Spring 1988).

## CONCURRING AND DISSENTING OPINION

Justice SAYLOR.

On the fair-warning issue implicated by Appellant's conviction for possessing an instrument of a crime, I agree with the position taken by President Judge Emeritus McEwen in his concurring and dissenting opinion in the Superior Court. *See Commonwealth v. Magliocco,* 806 A.2d 1280, 1290 (Pa.Super.2002) (McEwen, P.J.E., concurring and dissenting). Principally, I support the position that, under applicable due process principles requiring fair warning of punitive consequences, the corrective construction of the possession-of-an-instrument-of-crime statute applied by the majority is too remote from the statute's prescribed terms to justify departure from those plain terms to support the imposition of criminal punishment. *See generally McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931) ("Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.").

On the inconsistent verdicts issue, I would adopt the Superior Court's view that, particularly given the significance of the grading of the offense of terroristic threats to grading of the derivative, ethnic intimidation offense, *see* 18 Pa.C.S. § 2710(b), as a matter of statutory construction, the particular statute under consideration should be construed as requiring an actual conviction of the underlying offense as an essential

element. *See Magliocco*, 806 A.2d at 1287; *accord* COMMON-WEALTH OF PENNSYLVANIA COMMISSION ON SENTENCING, SENTENC-ING GUIDELINES IMPLEMENTATION MANUAL § 303.3(d), at 95 (5th ed.1997) (indicating that "[c]onviction for Ethnic Intimidation necessarily requires conviction for one of the underlying offenses listed").[1] I am less comfortable with the majority's approach, which appears to rely on principles of constitutional law and/or to represent a common-law ruling extending outside the ethnic intimidation context. To the degree that constitutional principles are involved, the majority's holding appears to me to be in tension with decisions of the United States Supreme Court. *Cf. United States v. Powell*, 469 U.S. 57, 64–69, 105 S.Ct. 471, 476–79, 83 L.Ed.2d 461 (1984) (declining to overturn a criminal conviction based upon inconsistency between verdicts, where jurors convicted a defendant of using the telephone to facilitate the commission of certain felonies, but acquitted on the felony counts themselves).[2] In terms of common law decision making, I acknowledge that there are reasonable counterarguments lodged against the approach taken in prevailing decisions governing inconsistent verdicts. *See, e.g.*, Eric L. Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts*, 111 HARV. L.REV. 771 (1998). It has been the concern of the United States Supreme Court however, that, once exceptions to the general rule against the affordance of relief based on inconsistent verdicts are devised, they are likely to overcome the general rule. *See Powell*, 469 U.S. at 67, 105 S.Ct. at 478. The Court's reasoning is that distinctions defining the exceptions, including the prescribed-necessary-offense basis adopted by the majority here, cannot be reasonably maintained. *See id.* (rejecting a prescribed-necessary-offense exception to the general rule proscribing relief based on inconsistent verdicts as "fall[ing] almost of its own weight").

1. As Magliocco notes, such construction also avoids any conflict with the *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), line of decisions in instances in which there is no jury waiver.

2. Similar holdings have been rendered in matters in which there was a jury waiver. *See Harris v. Rivera*, 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981).

Given such difficulties, I would reserve the broader review for a case in which it is essential to the mandate.