J-S37023-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
:            PENNSYLVANIA
:
v.                    :
:
:
:
TERRELL BRIDGET             :
:
           Appellant        :    No. 72 EDA 2023

Appeal from the Judgment of Sentence Entered March 7, 2019
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008648-2017

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
:            PENNSYLVANIA
:
v.                    :
:
:
:
TERRELL BRIDGET             :
:
           Appellant        :    No. 74 EDA 2023

Appeal from the Judgment of Sentence Entered March 7, 2019
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008655-2017

BEFORE: BENDER, P.J.E., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:         **FILED FEBRUARY 9, 2024**

Terrell Bridget ("Bridget") appeals from the judgment of sentence imposed following his convictions for aggravated assault, possessing an instrument of crime ("PIC"), rape of a child, and related offenses.[1] We affirm.

The trial court set forth the following factual and procedural history:

---

[1] *See* 18 Pa.C.S.A. §§ 2702(a)(1), 907, 3121(c).

[Trial testimony reveals the following.] Natalie Stavas, M.D. ("Dr. Stavas") testified at trial as an expert "in the field of child sexual and physical abuse." She is an attending physician at The Children's Hospital of Philadelphia ("CHOP") and a member of the hospital's "child protection team," which assesses whether an injured child is the victim of neglect or abuse.

Dr. Stavas examined the two minor victims in this case, "N.J." and "J.J.," who presented to CHOP [i]n July [] 2017. The four-year-old J.J. presented to the emergency room with bruises and abrasions that raised suspicions of child abuse. When Dr. Stavas's team examined J.J. on the following day, the child informed them that he was "beaten," "kicked," "choked," and struck with a belt multiple times by a "man in his home." Dr. Stavas photographed J.J.'s wounds, which included ruptured blood vessels in his eyes (subconjunctival hemorrhages), facial abrasions, bruising around his neck, chest abrasions, "loop mark" bruising on his back indicating he had been struck with an object, and extensive bruising on his legs and arms.

The photographs show "pattern bruising" on J.J.'s legs that is consistent with being struck "repeatedly with some sort of object that had a linear edge to it[.]" The bruising shape was consistent with "a long and double belt." Crescent-shaped marks on J.J.'s back likewise indicated that someone struck him there with a belt buckle and bruising around his neck was consistent with someone having choked him. Dr. Stavas testified that the broken blood vessels in J.J.'s eyes, coupled with the bruising on his neck, indicates that J.J. was indeed choked. Blood and enzyme testing confirmed that J.J. sustained muscle damage from the beatings. J.J.'s injuries "appeared to be at different stages" and some were older than others. Based on these extensive injuries, Dr. Stavas determined that someone physically abused [J.J.]

Dr. Stavas also examined the nine-year-old N.J., who complained of "significant vaginal pain," itchiness, and burning when she peed. Dr. Stavas noted no abnormalities on N.J.'s genitalia. However, she testified that 95% of sexually abused children have normal exams, meaning their genitalia contain no "evidence of prior injury or penetration." Moreover, although N.J. denied **at the time** that anyone touched her "private parts," Dr. Stavas ordered lab testing which established that N.J. contracted "a sexually transmitted disease called Trichomonas."

Dr. Stavas testified that Trichomonas ("Trich") is a parasite that lives in the genital tracts of men and women, and that the most common way to transmit the disease to children is through sexual abuse. The disease transmits "through sexual contact with infected secretions," and its symptoms include burning, itching, and vaginal pain while peeing. Because [Trich] can survive outside the body only briefly, and only in warm and moist environments, the parasite does not "live very long on things, like, toilet seats or rags."

Dr. Stavas testified that there are case reports of adults claiming to have contracted [Trich] from towels and toilet seats, but there are no reports of prepubescent children contracting the STD "from any other way except through sexual transmission." [Trich] is most-commonly transmitted through secretions from infected genitalia contacting another person's genitalia. The only **other** way for a child to be infected is if "a large amount" of infected secretion survives on a surface for a short period of time, during which the secretion somehow enters the child's exposed "private parts" or is wiped on the child's genitals with a rag. To transmit the infection by a towel or rag, the cloth "would have to be wet and moist" and "the secretions would have to be directly … rubbed up into the child's private part area."

Therefore, when Dr. Stavas's team discovers [Trich] in a prepubescent child, they deem it "extremely likely" that the disease "was given to them through sexual abuse."

Consistent with Dr. Stavas's unrebutted expert testimony, N.J. testified at trial that [Bridget] **did** sexually abuse her on multiple occasions. [Bridget] would send N.J. to the bathroom, close the door, tell her to remove her pants, and insert his penis in her anus. [Bridget] assaulted N.J. the same way in other rooms, including in the living room and in the bedroom of N.J.'s mother. During the abuse, N.J. closed her eyes, cried, and felt discharge on her butt from [Bridget's] penis that she did not see[,] but described as "pee." [Bridget] also inserted his penis inside N.J[.]'s mouth and placed his fingers on her vagina. Although N.J. told her mother about the abuse, her mother "said she didn't believe [her]."

On the day that she presented to CHOP, N.J. witnessed [Bridget] beat her brother J.J. with a belt, step on his stomach, kick him, and choke him around the neck. J.J. and N.J. both cried

and pleaded with [Bridget] to stop. When N.J.'s mother returned home after the beating, J.J. told her what occurred, and she called the police. N.J. testified that she initially denied being sexually abused because [Bridget] "told [her] not to tell nobody."

J.J. likewise testified at trial that [Bridget] physically abused him on multiple occasions, stepped on his stomach and chest, and whipped him with a belt.

The victims' mother, D[.] Jones ("Ms. Jones"), . . . testified and claimed that[,] before her children went to CHOP [i]n July [] 2017, she never saw any marks on them. She testified that [Bridget] disciplined the children upon first moving into the home in 2015, but that he did not physically abuse them until 2016. Ms. Jones allowed [Bridget] to "discipline" her children— *i.e.,* beat them with a belt—"because they didn't have a father figure."

Ms. Jones admitted that her daughter N.J. ***did*** tell her about [Bridget's] sexual abuse, but she claimed her "depression" prevented her from taking N.J. to the hospital. Although N.J. also [told her] that her vagina was hurting and burning, Ms. Jones claimed a doctor advised it was only bacteria. [Ms. Jones testified that she had previously had Trich, which she believed she had contracted from Bridget.]

[Bridget] testified last and denied molesting N.J. [as well as] being diagnosed with [Trich]. [Officer Jose Viera ("Officer Viera"), who was assigned to the Special Victims Unit and took a statement from Bridget in August 2017, testified that Bridget admitted to having Trich, which Bridget conceded at trial, though Bridget asserted he had previously misspoken. Bridget] testified that he "disciplined" the victims with Ms. Jones's approval and that he struck them multiple times with a belt. [Bridget] claimed that the day before J.J. presented to CHOP, he spanked J.J. with a belt because [J.J.] bit N.J. Ms. Jones came home during the spanking but said nothing. [Bridget] testified that the next day, however, he and Ms. Jones had an argument[,] and Ms. Jones told him to leave her home. [Bridget] refused, and police officers soon after arrived.

* * * *

[I]n September [] 2018, following a bench trial, the [c]ourt found [Bridget] guilty under docket number

CP-51-CR-0008648-2017 of aggravated assault . . ., strangulation (18 Pa.C.S.A. § 2718(a)(1)), endangering the welfare of a child (18 Pa.C.S.A. § 4304(a)(1)), [PIC], simple assault (18 Pa.C.S.A. § 2701(a)), and recklessly endangering another person (18 Pa.C.S.A. § 2705).

Under docket number CP-51-CR-0008655-2017, the [c]ourt found [Bridget] guilty of rape of a child . . ., involuntary deviate sexual intercourse with a child [("IDSI")] (18 Pa.C.S.A. § 3123(b)), aggravated indecent assault of a child (18 Pa.C.S.A. § 3125(b)), unlawful contact with a minor (18 Pa.C.S.A. § 6318(a)(1)), endangering the welfare of a child [("EWOC")] (18 Pa.C.S.A. § 4304(a)(1)), corruption of minors (18 Pa.C.S.A. § 6301(a)(1)(ii)), indecent assault (18 Pa.C.S.A. § 3126(a)(7)), and simple assault (18 Pa.C.S.A. § 2701(a)).

On March 7, 2019, the [c]ourt sentenced [Bridget] to an aggregate term of twelve (12) to twenty-four (24) years' incarceration. On March 13, 2019, [Bridget] filed post-sentence motions in each of his cases . . ..

* * * *

[Following denial of Bridget's post-sentence motions, he appealed, and on direct review, this Court affirmed in June 2021, finding his issues waived for failure to raise them in a Pa.R.A.P. 1925(b) statement. Bridget] filed a timely PCRA petition [i]n July [] 2021. The PCRA petition was granted[, and the PCRA court] reinstated [Bridget's direct appeal rights] [n]unc [p]ro [t]unc. The [c]ourt also appointed a new [a]ppellate [c]ounsel.

Trial Court Opinion, 4/19/23, at 1-7 (paragraphs re-ordered for clarity; internal footnotes and citations to the record omitted). Bridget once again timely appealed, and both Bridget and the trial court complied with Pa.R.A.P. 1925.

Bridget raises the following issues for our review:

1. Whether the evidence was sufficient to convict [Bridget] of [PIC?]

2. Whether the verdict of guilty with respect to the charges of rape of a child, IDSI, aggravated indecent assault of a child, unlawful contact with a minor, EWOC, [corruption of minors], indecent assault and simple assault is against the weight of the evidence to such a degree that it shocks one's conscience in the situation where [N.J.'s] testimony was inconsistent to a degree to render it not credible, including with respect to the type of sexual abuse that occurred, as well as inconsistencies with respect to the physical evidence of who had a sexual[ly] transmitted disease and the manner in which the disease was transmitted[?]

Bridget's Brief at 6 (unnecessary capitalization omitted).

In his first issue, Bridget presents a sufficiency challenge to his conviction for PIC. Our standard of review for sufficiency of the evidence issues is as follows:

> . . . [W]e evaluate the record in the light most favorable to the verdict[-]winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

***Commonwealth v. Franklin***, 69 A.3d 719, 722–23 (Pa. Super. 2013) (internal citations and quotations omitted). Additionally, the fact-finder is free to believe all, part, or none of the evidence. ***See Commonwealth v. Greenlee***, 212 A.3d 1038, 1042 (Pa. Super. 2019).

For PIC, the Crimes Code provides: "A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a). An instrument of crime is defined as: "(1) Anything specially made or specially adapted for criminal use[; or] (2) Anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." ***Id***. § 907(d) (definitions). An object may be an instrument of crime if it is used toward a criminal end, even if the object is not commonly used for criminal purposes. ***See***, ***e.g.***, ***Commonwealth v. Magliocco***, 883 A.2d 479, 487-89 (Pa. 2005) (concluding that a PIC conviction was appropriate where the defendant swung a baseball bat at two young girls even without a showing that a baseball bat is commonly used for criminal purposes).

In his first issue, Bridget asserts the evidence was insufficient to sustain his conviction for PIC because "there is no evidence that he used a belt to commit a crime." Bridget's Brief at 9. Bridget argues that the use of a belt "without more, does not lead to a finding of child abuse." ***See id***. at 10. He submits that he used the belt merely for disciplinary purposes. ***See id***. at 11. He points to testimony by Ms. Jones, as well as himself, to the effect that he

was the disciplinarian of the household. **See id**. at 11-12. Bridget argues that while Dr. Stavas testified that there were loop marks on J.J., which indicated the use of a belt, they were old "and not the result of the current abusive incident[.]" **Id**. at 15.

The trial court considered Bridget's arguments and concluded they merited no relief:

> Here, [Bridget] used a belt with the intent to beat J.J. Upon examination . . ., the minor victim informed Dr. Stavas's team he had been "beaten," "kicked," "choked," and struck with a belt multiple times by "a man in his home." Loop mark bruising on is back indicated J.J. had been struck with an object. The "pattern bruising" was consistent with being struck repeatedly. The bruising shape was consistent with a long and double belt. Crescent-shaped [marks] on J.J.'s back indicated that J.J had been severely beaten with a belt. Though a belt has appropriate lawful uses such as wearing as an accessory to holster up trousers, the belt was possessed by [Bridget] for criminal purposes. [Bridget] used the belt to viciously assault child J.J. Hence, after viewing the evidence in the light most favorable to the prosecution, the essential elements of the crime were proven beyond a reasonable doubt.

Trial Court Opinion, 4/19/23, at 12.

Following our review, we conclude the evidence, in the light most favorable to the Commonwealth as the verdict-winner, is sufficient to sustain Bridget's conviction for PIC. J.J. testified Bridget hit him on the arms and legs with the belt while J.J. was lying on the floor. **See** N.T., 9/28/18, at 103-04. Bridget hit him "hard" more than one time. **Id**. at 105. This, J.J. explained, was after Bridget had made him pick up heavy weights. **See id**. at 109. N.J. saw Bridget hit J.J. with the belt at the same time Bridget was forcing J.J. to

do pushups and lift heavy weights, and during the same interaction in which Bridget stepped on J.J.'s stomach and choked him. *See id*. at 87-91. While Dr. Stavas testified there were some marks that were older injuries, "more like scars or healing marks," for example, on J.J.'s back, that were consistent with J.J. being struck by a belt buckle, *see id*. at 30-31, Dr. Stavas also testified that there were multiple bruises on J.J.'s leg which were "indicative of inflicted injury," and that a belt could have been an object used to inflict those injuries. *See id*. at 30. Dr. Stavas contrasted the marks on J.J.'s back, which were scars or healing marks, with the "bright-red raw marks that we saw on the legs." *Id*. at 31. Thus, the above evidence shows that Bridget forced the four-year-old J.J. to do pushups, lift heavy weights, and then hit him on the arms and legs repeatedly with a belt, which left "bright-red raw marks," after which he stepped on J.J.'s stomach and then choked him. We have no difficulty concluding that Bridget employed the belt criminally, as part of his aggravated assault of J.J. *See* 18 Pa.C.S.A. § 907(d) (defining an "instrument of crime" as, *inter alia*, "[a]nything used for criminal purposes"); *Magliocco*, 883 A.2d at 487-89 (instrument of crime need not be commonly used for criminal purposes).

In his second issue, Bridget asserts his convictions arising from his abuse of N.J. are against the weight of the evidence. Our standard of review for weight challenges is as follows:

A motion for new trial on grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence. The decision whether to grant a new trial on this basis rests within the discretion of the trial court. A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and make the award of a new trial imperative so that right may be given another opportunity to prevail. The role of an appellate court in reviewing the weight of the evidence is very limited. The purpose of that review is to determine whether the trial court abused its discretion and not to substitute the reviewing Court's judgment for that of the trial court. Accordingly, where the evidence is conflicting, the credibility of the witnesses is solely for the jury, and if its finding is supported by the record, the trial court's denial of a motion for new trial will not be disturbed.

*Commonwealth v. Holmes*, 663 A.2d 771, 774 (Pa. Super. 1995) (internal citations omitted). "A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but claims that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Lyons*, 833 A.2d 245, 258 (Pa. Super. 2003) (internal citation and quotations omitted). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice. *See Commonwealth v. Smith*, 181 A.3d 1168, 1187 (Pa. Super. 2018). Additionally, in assessing a claim that the verdict was against the weight of the evidence, this Court will not substitute its judgment for that of

the factfinder, which is free to assess the credibility of witnesses and to believe all, part, or none of the evidence presented. *See Commonwealth v. Fortson*, 165 A.3d 10, 16 (Pa. Super. 2017). Inconsistencies in a victim's testimony goes to the factfinder's credibility determination. *See Commonwealth v. Izurieta*, 171 A.3d 803, 809-10 (Pa. Super. 2017).

Bridget argues that N.J. tested positive for the sexually transmitted disease Trich in her vagina, however, N.J. testified that Bridget did not vaginally penetrate her, but rather forced her to engage in anal and oral penetration. *See* Bridget's Brief at 17. Additionally, Dr. Stavas testified that contact with Trich during anal rape would lead to Trich in the anus. *See id*. at 18. Bridget additionally notes that Ms. Jones "was the only person in the home who had a sexually transmitted disease diagnosed by a doctor"; N.J. testified at trial that Bridget orally raped her when she had previously stated that Bridget had only anally raped her; and "[a]t the hospital, [N.J.'s] mom was overheard saying that the victim was making this all about her." *Id*. at 18-19.

The trial court considered these arguments and rejected them:

> . . . The weight of the evidence supports that [Bridget] sexually preyed on [N.J.]. . . . [T]he fact that the young child's testimony may contain minor inconsistencies does not shock one's sense of justice to render N.J.'s testimony not credible or disrupt the weight of the evidence that soundly establishes [Bridget's] guilt.
>
> N.J. testified that [Bridget] sexually abused her multiple times. She testified that [Bridget] would send her to the bathroom, close the door, tell her to remove her pants, and insert

- 11 -

his penis in her anus. [Bridget] assaulted N.J. the same way in other rooms, during which she closed her eyes, cried, and felt discharge on her butt from [Bridget's] penis. [Bridget] also inserted his penis inside N.J.'s mouth and placed his fingers on her vagina. Although N.J. told her mother about the sexual abuse, her mother "said she didn't believe [her]."

Dr. Stavas corroborated N.J.'s testimony. She testified that lab testing established that N.J. contracted [Trich], which is a parasite transmitted "through sexual contact with infected secretions." Because [Trich] can survive outside the body only briefly, and only in warm and moist environments, the parasite does not "live very long on things, like, toilet seats or rags." Additionally, Dr. Stavas testified that [Trich] is most-commonly transmitted through secretions from infected genitalia contacting another person's genitalia. There are no reports of prepubescent children contracting the STD "from any other way except through sexual transmission." . . . Therefore, when Dr. Stavas's team discovers [Trich] in a prepubescent child, they deem it "extremely likely" that the disease "was given to them through sexual abuse."

N.J. testified that she was anally raped multiple times. Her anus, where [Bridget] repeatedly placed his **infected** penis, obviously is closely aligned with her vagina. It requires no farfetched inference to find that [Bridget's] repeated discharge in **this** proximity was the source of N.J.'s vaginal infection. Indeed, as Dr. Stavas's testimony established, it is far more likely that N.J. contracted [Trich] through [Bridget's] discharge in her anus area than that the disease was somehow rubbed into her vagina from some other secretion-bearing surface.

Trial Court Opinion, 4/19/23, at 10-11 (citations to the record omitted; emphasis in original).

Following our review, we discern no abuse of discretion by the trial court in denying Bridget's weight of the evidence claims. N.J. testified that Bridget, *inter alia*, anally raped her. **See** N.T., 9/28/18, at 78-82. It is uncontested that N.J. contracted Trich in her vagina. **See**, **e.g.**, **id**. at 40 (Dr. Stavas indicating that N.J.'s lab work "came back positive for [the STD] called

Trich[]").[2]   Officer Viera testified that Bridget admitted to him that he had

Trich.  *See id*. at 141.  Bridget, who testified in his own defense, did not deny

that he told Officer Viera he had the STD, but instead downplayed his

admission, saying, "I might have spoke too fast [sic,]" and that he "might

have spoke falsely [sic]."  *Id*. at 154, 161.  That Bridget did not have an

official diagnosis of Trich by a doctor does not undermine his admission that

he had Trich.[3]   Further, while Dr. Stavas testified that a person, who was

anally penetrated by someone with Trich, would get Trich in their anus, *see*

*id*. at 61, Dr. Stavas also noted that, "[e]jaculation, rubbing, there's a variety

of sexual ways in which, I think, genitals can touch or exchange their fluids,"

resulting in transmission of Trich.  *See id*. at 62-63.  Dr. Stavas additionally

explained, "There's never been a report of a child getting, a prepubescent

child, getting [T]rich[] from any other way except through sexual

transmission."  *Id*. at 44.  Lastly, N.J.'s inconsistency, *i.e.*, her assertion that

Bridget had not only anally, but also orally, raped her, which contradicted her

---

[2] Dr. Stavas did not test N.J. for Trich in her anus; therefore, the doctor cannot say whether N.J. had the disease there.  *See* N.T., 9/28/18, at 61.  Dr. Stavas explained that they did not test N.J.'s anus because once the lab work came back, they started treatment "right away for [the Trich], because it's very bad for kids to have it[;] so the medical service team she was on[] immediately initiated antibiotics, which can cause her test to be negative after that time." *Id*. at 61-62.

[3] During this timeframe, Ms. Jones also contracted Trich, which she attributed to Bridget, because he was the only one she was sexually active with at the time.  *See* N.T., 9/28/18, at 122-23.

prior testimony that her anus was "the only place he put it," was explored during cross-examination, and was for the fact-finder to resolve in weighing N.J.'s credibility. **See Izurieta**, 171 A.3d at 809-10; **cf**. N.T., 9/28/18, at 94-95.[4] Bridget has thus failed to show that the trial court abused its discretion in concluding the evidence did not shock its sense of justice. **See Holmes**, 663 A.2d at 774. For the foregoing reasons, Bridget's weight of the evidence challenge merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/9/2024

_____

[4] We reject Bridget's argument that Ms. Jones's statement at the hospital that N.J. was "making this about her" contributes to the verdict being against the weight of the evidence. We note that Ms. Jones denied stating this, but, moreover, even if taken as true, this merely demonstrates Ms. Jones's displeasure about N.J.'s disclosure. **See** N.T., 9/28/18, at 124.