J-A24045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THOMAS ALEXANDER PATTI | : | |
| | : | |
| Appellant | : | No. 3036 EDA 2023 |

Appeal from the Judgment of Sentence Entered May 23, 2023
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-CR-0002522-2018

BEFORE:  LAZARUS, P.J., KING, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED APRIL 8, 2025**

Thomas Alexander Patti ("Patti") appeals from the judgment of sentence imposed following his conviction for involuntary manslaughter.[1]  We affirm.

The trial court summarized the factual history underlying this matter as follows:

> On Saturday November 26, 2016[,] at approximately 1:53 a.m., [police] were dispatched to a vehicle accident.  At approximately 1:56 a.m. the first responding officer, Brandon Fenner [("Officer Fenner")], arrived on the scene and determined the vehicle involved had been occupied by two persons, both of whom were located outside the vehicle at that time.  Later accident reconstruction reports detailed that the vehicle crashed into the construction barriers, rolled over, and ended right-side-up, blocking the only lane of traffic.  The night was foggy, but not enough to be the cause of the accident.
>
> One of the people, later identified as Cody Bensel [("the decedent")], was lying face down near the rear passenger side of the [vehicle] and was declared deceased.  Later autopsy results

_____

[1] *See* 18 Pa.C.S.A. § 2504(a).

showed the cause of death to [the decedent] was blunt force injuries of head and neck. These injuries are consistent with ejection from the vehicle after collision.

[Patti] was the only other person at the scene and told Officer Fenner he was a passenger in the vehicle. [Patti] later related that he was wearing his seatbelt during the collision and was therefore uninjured, but had a pain on his left shoulder. During this interaction, Officer Fenner noticed [Patti] had glassy, bloodshot eyes, and presented the distinct odor of alcohol on his person. [Patti] admitted to having consumed alcohol with [the decedent] prior to the collision. Based on his observations, Officer Fenner requested [Patti] submit to a blood draw, which he originally consented to, but later refused. An accident reconstruction crew arrived on the scene shortly after Officer Fenner left with [Patti] to transport him to the [driving under the influence ("DUI")] center at the correctional facility in order to draw [Patti's] blood.

Upon arriving at the DUI center, the relevant personnel informed Officer Fenner that they could not draw [Patti's] blood, because he was not under arrest. After informing his supervisors of the issue, Officer Fenner informed [Patti] he would be transported to [a hospital] . . . for a blood draw, to which [Patti] again acquiesced. Once at the hospital, [Patti] withdrew his consent. Officer Fenner then applied for a search warrant[. While waiting for the search warrant to be issued, Officer Fenner took Patti to the Stroud Area Police Station where he was placed in a room with Officer Terry Eilber ("Officer Eilber"). Patti made unsolicited statements [to] Officer Eiber, including that his life was over and that it was all his fault. The search warrant] was granted later that morning, and executed . . . at 5:37 a.m.[, three and one-half hours after the accident]. The certified laboratory report confirmed that [Patti] had a blood alcohol content (hereinafter "BAC") of .16%, THC, and both Diazepam and Nordiazepam within therapeutic levels in his blood. After the warrant had been executed, Officer Fenner drove [Patti] to his residence.

The accident reconstruction report, prepared by [Corporal] Kenneth Palmer [("Corporal Palmer")], noted that traffic patterns existed at the time of the collision which limited travel through the construction zone to only the northbound lane of travel. This report suggested that the driver failed to take appropriate action while travelling through the construction zone and collided with

traffic control devices, resulting in the vehicle's rollover. Debris located on the seats and vehicle damage indicated that the right front seat passenger ejected during the collision, and this suggested the identity of said passenger was that of the deceased . . .. Additionally, DNA was located on the vehicle's hardtop. DNA evidence later recovered from within the vehicle further advanced the theory that it was [the decedent] who was ejected from the passenger seat. Further analysis of DNA evidence located on the vehicle steering wheel indicated that [Patti] was the driver. Importantly, [the vehicle was owned by Patti's grandmother and Patti] usually drove this vehicle. It was also later determined that [Patti] had moved the body of [the decedent] to implicate [the decedent] as the driver of the vehicle. [There was also a 911 call made by someone who was in the area of the accident just after it had happened, in which the caller was yelling to Patti not to move the body.]

The officers later learned that both [Patti] and [the decedent] were *en route* to meet Mr. Chad Riddle immediately preceding the accident, according to Mr. Riddle's sworn statement. [The decedent's] cell phone records were obtained through a search warrant, which confirmed that [shortly before the accident] at 1:43 a.m. an outgoing call was placed from [the decedent's] cellphone to Mr. Riddle's phone number. [The decedent] was talking to Mr. Riddle and during the course of the conversation, Mr. Riddle heard [the decedent] ask, "[a]re you ok to drive?" Further investigation also revealed that at the time of the collision, [Patti] had a DUI suspended Pennsylvania driver's license.

On May 25, 2018, [Patti] was charged with homicide by vehicle while under the influence, homicide by vehicle, accidents involving death or personal injury while not properly licensed, false report, driving under influence of alcohol or controlled substance first offense, highest rate of alcohol-first offense, DUI combination of alcohol and drugs-first offense, driving while operating privilege is suspended or revoked, driving with BAC .02 or greater while suspended, obedience to traffic control devices-hazardous conditions, reckless driving, careless driving, false report, tampering with or fabricating physical evidence, aggravated assault by vehicle while under the influence, and involuntary manslaughter. [Patti] waived his preliminary hearing . . . and . . . the Commonwealth filed a criminal information with the same charges.

Trial Court Opinion, 11/18/19, at 1-4 (citations, quotation marks, and unnecessary capitalization omitted).

Patti filed a motion to suppress the statements he made to Officer Eiber while at the police station awaiting a warrant for his blood draw. Patti additionally challenged Corporal Palmer's expert qualifications and methodology, contending that a **Frye**[2] hearing was necessary. Following a hearing, the trial court denied suppression and determined that no **Frye** hearing was necessary because Corporal Palmer's opinions were based on generally accepted scientific methodologies which were not novel. The matter proceeded to a bifurcated jury/non-jury trial in January 2023. At the conclusion of the jury trial, the jury found Patti guilty of involuntary manslaughter but found him not guilty of all other felony and misdemeanor charges. The matter then proceeded immediately to a non-jury trial at which the trial court acquitted Patti of all summary charges. On May 23, 2023, the trial court sentenced Patti to serve eighteen to sixty months in prison. Patti filed a timely post-sentence motion which the trial court denied. Patti then filed a timely notice of appeal and both he and the trial court complied with Pa.R.A.P. 1925.

Patti raises the following issues for our review:

    I.    Did the trial court err in finding sufficient evidence to convict Patti of involuntary manslaughter where the Commonwealth failed to prove Patti was driving the [vehicle] at the time of

_____

[2] **See Frye v. United States**, 293 F. 1013 (D.C Cir. 1923).

the crash as charged in the bills of information, the Commonwealth never charged Patti with committing involuntary manslaughter by failing to prevent the decedent from driving the [vehicle] while intoxicated, so any conviction based on that theory of liability would present an illegal variance from the conduct specified in the bills of information, and even if such a variance were somehow permissible, the Commonwealth failed to show Patti acted in a grossly negligent or reckless manner or that he caused the decedent's death?

II. Whether the trial court erred in convicting Patti of involuntary manslaughter where the Commonwealth charged him specifically with committing the offense by driving the [vehicle] and losing control of it due to recklessness or gross negligence, but the judge and jury acquitted him of every other offense, all of which required either driving, committing traffic offenses while driving, or making false statements about who was driving?

III. Did the trial court abuse its discretion in denying the post-sentence motion for a new trial because the verdict was against the weight of the evidence?

IV. Did the trial court err in allowing Corporal . . . Palmer, who had no relevant expertise beyond teaching driver's education classes and conducting state car inspections, to testify as an expert in accident reconstruction and provide his opinion on the ultimate issue where the opinion was actually Corporal Palmer's lay assessment of circumstantial evidence rather than a legitimate expert opinion based on any generally accepted scientific methodology?

V. Should the trial court have suppressed the ambiguous statements allegedly made by Patti at the police station because the police subjected Patti to a custodial interrogation without first providing him with **Miranda**[3] warnings?

---

[3] **Miranda v. Arizona**, 384 U.S. 436 (1966) (holding that a defendant that is subject to custodial interrogation must be advised of his or her constitutional right to remain silent and his or her right to a lawyer in clear and unequivocal language).

Patti's Brief at 5-6 (footnote added).

In his first issue, Patti challenges the sufficiency of the evidence supporting his conviction for involuntary manslaughter. A challenge to the sufficiency of the evidence presents a question of law for which our standard of review is *de novo* and our scope of review is plenary. **See Commonwealth v. Johnson**, 236 A.3d 1141, 1152 (Pa. Super. 2020).

When considering a challenge to the sufficiency of the evidence:

> [W]e evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

**Commonwealth v. Franklin**, 69 A.3d 719, 722-23 (Pa. Super. 2013) (internal quotations and citations omitted). Importantly, "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence

produced, is free to believe all, part or none of the evidence." *Commonwealth v. Orr*, 38 A.3d 868, 873 (Pa. Super. 2011) (*en banc*).

A person is guilty of involuntary manslaughter when "as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504(a). Stated differently, involuntary manslaughter requires: (1) a mental state of either recklessness or gross negligence; and (2) a causal nexus between the conduct of the accused and the death of the victim. *See Commonwealth v. McCloskey*, 835 A.2d 801, 806 (Pa. Super. 2003).

Further, recklessness is defined as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3).

Patti argues that the evidence was insufficient to support his conviction for involuntary manslaughter. Although Patti concedes that causing a fatal collision while driving while intoxicated could support a conviction for involuntary manslaughter, he nevertheless claims that the Commonwealth failed to prove that he was the driver of the vehicle at the time of the accident. Patti maintains that the Commonwealth's theory that he was the driver hinged

on the following: the car was his grandmother's; the DNA evidence indicated that the decedent was the passenger; the keys to the vehicle were found some distance away from the vehicle; Riddle's statement that he overheard Patti indicating prior to the accident that he planned to drive; the fact that the decedent's body appeared to have been moved; and Patti's statements to Officer Eilber that his life was over and that it was all his fault. Patti points out that neither he nor the decedent were in the vehicle when the police arrived, Patti told police that he had not been driving, the DNA evidence showed that multiple people had touched the steering wheel, and neither expert could exclude the decedent from being one of the people who touched the steering wheel. Patti further argues the decedent's blood was also on the driver's side of the vehicle, the driver's side roof had come detached, and the passenger's side roof was the only portion of the roof which remained fastened to the vehicle. According to Patti, there was very little of the decedent's blood on the passenger side, and the blood that was on the passenger side was outside of the vehicle after it had rolled onto it or him.[4] Finally, Patti argues

_____

[4] We note that Patti conflates his sufficiency challenge with a weight of the evidence claim. The majority of Patti's sufficiency claim consists of arguments that certain evidence should have been accorded greater or lesser weight than other evidence. For example, Patti attempts to minimize the significance of the evidence which suggested that he was the driver of the vehicle by providing alternate inferences and explanations. For example, Patti argues, *inter alia*: that the keys to the vehicle were found by police where Patti had been directed by police to sit and wait, and they likely fell out of his pocket; Riddle's testimony was not credible because he was a convicted thief who did
*(Footnote Continued Next Page)*

that the Commonwealth failed to introduce sufficient evidence that he acted recklessly or with gross negligence. Patti claims that the mere act of driving while intoxicated, without more, does not establish recklessness. Alternatively, Patti asserts that there is no evidence that he knew the decedent was intoxicated or caused the decedent's death by recklessly permitting him to drive.[5]

_____

not see who was driving; even if moved, the decedent's body was within a foot of where it landed; and Patti's comments to Officer Eilber might have been made because he blamed himself for permitting the decedent to drive and not because he blamed himself for driving while extremely intoxicated and thereby causing the decedent's death. However, these arguments implicate the weight of the evidence and credibility of witnesses rather than the sufficiency of the evidence, and are wholly inappropriate for a sufficiency challenge. *See Commonwealth v. Bowen*, 55 A.3d 1254, 1262 (Pa. Super. 2012) (holding that a claim that factfinder should have believed appellant's version of events rather than Commonwealth's goes to weight, not sufficiency of evidence); *see also Commonwealth v. Juray*, 275 A.3d 1037, 1043 (Pa. Super 2022) (holding that a sufficiency of the evidence review does not include an assessment of credibility of testimony offered by the Commonwealth, which implicates the weight of the evidence). While we could reject Patti's sufficiency challenge on this basis alone, we decline to do so. *See Commonwealth v. Small*, 741 A.2d 666, 672 (Pa. 1999) (holding that where an appellant phrases an issue as a challenge to the sufficiency of the evidence, but the argument that the appellant provides goes to the weight of the evidence, the sufficiency challenge must fail).

[5] In presenting his sufficiency challenge, Patti attempts to inject multiple other unrelated issues into his argument. For example, Patti claims that the Commonwealth failed to properly maintain the vehicle after the accident, which may have resulted in the loss of potential evidence. Patti litigated this issue in a pretrial motion to dismiss, and the trial court determined that no spoliation of evidence had occurred. Moreover, even if successful, a spoliation claim may result in an adverse inference, which is not evidence. Thus, even if Patti had been entitled to such an adverse inference, it would have no bearing on the question of whether the *evidence actually admitted* at trial was sufficient to support Patti's conviction. Additionally, Patti asserts that his

*(Footnote Continued Next Page)*

The trial court considered Patti's sufficiency challenge and determined that it lacked merit. The court reasoned:

> [T]he jury's verdict of involuntary manslaughter should be upheld as there was sufficient evidence presented upon which the jury could find beyond a reasonable doubt that [Patti] was the driver. There were only [two] people in the vehicle, being [Patti] and the decedent. [Patti] admitted that the vehicle involved in the accident was "usually driven and occupied by him (Patti)" and that his "family member owns the vehicle." (Police Report[, 5/28/18]).

> Further, Corporal . . . Palmer, who was admitted as an expert in accident reconstruction and automobile mechanics, testified that he appeared on the scene at 3:40 a.m. and walked the scene, taking measurements and pictures. (N.T., [1/23/23] at [] 115; 130-135). Corporal Palmer also testified that based on the undercarriage damage to the [vehicle] and location of items inside the vehicle, he believed the [vehicle] had rolled over and that [the decedent] was ejected from the front passenger seat of the vehicle. ([*Id*.] at [] 176-[]78; [181; 182:11-12, 20-21;] 197-[]99).

> There was also evidence establishing that [Patti] moved the decedent's body after the accident. Corporal Palmer testified that the location of the blood drops at the scene: "Indicated to me that the body was moved." ([*Id*.] at [] 161:6-11; Commonwealth's [E]xhibits 5, 6, 7. 8, and 10). Also, Corporal Palmer testified on direct examination that [the decedent] not having a shirt on also made him surmise that his body was moved as follows:

---

constitutional and due process rights may have been violated if the jury found that he recklessly permitted the decedent to drive, since such a finding would vary from the theory asserted in the bill of information (*i.e.*, that Patti was the driver). Such an argument requires us to speculate as to the jury's specific factual findings, which we may not do. **See Commonwealth v. Moore**, 103 A.3d 1240, 1247 (Pa. 2014) (holding that we may not interpret a jury acquittal as a specific factual finding with regard to the evidence). Moreover, claims of constitutional and due process violations are separate and distinct from a sufficiency challenge.

Q. What's significant about the shirt and its placement?

A. It's partially removed from his body. It's still in his, sort of, his left hand there. But the majority of his shirt is removed from his body.

Q. And going back again to your training and experience relative to the normal placement of bodies or objects ejected and things that have been moved and your kinematics training, which you referenced, based upon all that training and experience, are you able to offer an opinion as to the significance of that shirt, regarding any of that?

A. He was moved from his original location. It was more likely than not as a result of that.

Q. Why does that shirt indicate that to you?

A. He's not wearing it.

Q. And typically do people ejected lose their shirts?

A. There's a lot of evidence that ejections are all different. They could lose items. In this case, it's more as a result of being moved.

(N.T.[, 1/23/23, at] 161:6-11; 166:24-25; 167:1-21; Commonwealth's [E]xhibit[s 5, 6, 7. 8, 10,] 17 . . .).

There was also a 911 call made by someone who was in the area of the accident just after it had happened, in which the caller was yelling to [Patti] not to move the body. (Commonwealth's Exhibits 1 and 2 being the 911 call log and recording) (911 call played before the Jury – N.T.[, 1/23/23, at] 39:7-23)[;] N.T.[, 1/23/23,] at 28:15-23 & 32:9-17).

Chad Riddle testified that he knew the decedent . . . for twenty years from working together in landscaping and also socially, and that the two of them saw each other three or four times a week. (N.T.[, 1/13/23, at] 279-[]80). Mr. Riddle testified that on the morning of the accident, [the decedent] had called him while [he] and [Patti] were driving to Mr. Riddle's house. Mr. Riddle testified that during this phone conversation, he heard [the

decedent] ask [Patti] if he was ok to drive. (N.T.[, 1/23/23, at] 280-[]83; Commonwealth's Exhibit 25).

Finally, there was evidence that the driver of the vehicle had removed the keys from the [vehicle's] ignition post-accident. Specifically, Corporal Palmer testified that the [vehicle] keys were located about 50 feet way from the [vehicle's] final resting place. (N.T.[, 1/23/23, at] 190-[]94). When asked what the significance was of the keys not being in the [vehicle] from the accident, Corporal Palmer stated that they were removed from the [vehicle] due to the fact that in his training and experience, a roll-over would not dislodge the keys. (N.T.[, 1/23/23, at] 190-[]94 . . .

All of the above-referenced evidence, if believed by the jury, is sufficient evidence to sustain a guilty verdict of involuntary manslaughter based upon [Patti] being the driver of the [vehicle] at the time of the accident which resulted in [the decedent's] death.

Trial Court Opinion, 1/23/24, at 8-11 (some citations and unnecessary capitalization omitted).

Based on our review, we conclude that the Commonwealth presented sufficient evidence to support Patti's conviction for involuntary manslaughter. While there was no direct evidence that Patti was the driver of the vehicle at the time of the accident, the Commonwealth could sustain its burden of proof by wholly circumstantial evidence. *See Franklin*, 69 A.3d at 722-23. Moreover, the fact that the evidence was circumstantial does not preclude a conviction where the evidence, coupled with the reasonable inferences drawn therefrom, overcomes the presumption of innocence. *See id*.

Here, the jury was tasked with deciding whether Patti or the decedent was the driver at the time of the accident. In discharging this task, the jury was permitted to believe all, part, or none of the evidence. Viewing the

evidence in the light most favorable to the Commonwealth, the jury could reasonably infer that Patti was driving the vehicle at the time of the accident, given that: it was his grandmother's vehicle; he admitted that he was the person who usually drove the vehicle; minutes before the accident Riddle heard the decedent ask someone, presumably Patti, if he was ok to drive; Patti's DNA was on the steering wheel; Patti told police that his left shoulder hurt (which suggested an injury from the driver's seat belt); and Patti stated to Officer Eilber that his life was over and that it was all his fault. Moreover, the jury could also reasonably infer that Patti did not want anyone to discover that he was the driver of the vehicle at the time of the accident due to the fact that he was driving while intoxicated (with a BAC of .16 more than three and one-half hours after the accident, as well as THC and other narcotics), he was driving while his driver's license was suspended, and that he had caused the accident and the decedent's death. The jury could also reasonably infer that Patti took steps to prevent police from discovering that he was the driver, including taking the keys from the ignition and throwing them, trying to move the decedent's body away from the passenger side of the vehicle, and telling police that the decedent was driving the vehicle. Finally, the jury could reasonably infer that the comments Patti made to Officer Eilber while in custody were acknowledgments of his guilt in connection with driving while extremely intoxicated and causing the decedent's death. Accordingly, as the

evidence was sufficient to support the conviction for involuntary manslaughter, Patti's first issue merits no relief.[6]

In his second issue, Patti contends that the jury's inconsistent verdicts preclude his conviction for involuntary manslaughter. This Court has explained that:

> Inconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal. Rather, the rationale for allowing inconsistent verdicts is that it is the jury's sole prerogative to decide on which counts to convict in order to provide a defendant with sufficient punishment. When an acquittal on one count in an indictment is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity. Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies as long as there is sufficient evidence to support the verdict.

*Commonwealth v. Frisbie*, 889 A.2d 1271, 1273 (Pa. Super. 2005) (citations omitted).

_____

[6] Patti acknowledges that his conviction for involuntary manslaughter did not require that he was driving the vehicle at the time of the accident, and speculates that the jury may have convicted him of this offense based on a determination that he permitted the decedent to drive the vehicle while the decedent was intoxicated. Patti surmises that, if the jury did convict him on this basis, then such conviction varies from the bill of information, which did not advance this theory of liability. We decline Patti's invitation to speculate on the jury's specific factual findings, as we are prohibited from doing so. *See Moore*, 103 A.3d at 1247. Instead, we conclude that the evidence was sufficient to support a conviction for involuntary manslaughter based on a finding that Patti drove the vehicle in a reckless or grossly negligent manner while extremely intoxicated, thereby causing the accident and the decedent's death.

We may not interpret a jury acquittal as a specific factual finding with regard to the evidence. *See Moore*, 103 A.3d at 1247 (noting that "jury acquittals may not be interpreted as specific factual findings with regard to the evidence, as an acquittal does not definitively establish that the jury was not convinced of a defendant's guilt"); *see also Commonwealth v. Campbell*, 651 A.2d 1096, 1100 (Pa. 1994) (holding that, generally, "an acquittal cannot be interpreted as a specific finding in relation to some of the evidence"). This principle recognizes that a jury's decision to acquit may be due to leniency towards the defendant, a compromise among the jurors, or even a mistake. *See Moore*, 103 A.3d at 1246.

One narrow exception to this rule exists where the jury specifically acquits the defendant of an underlying crime, and that underlying crime is a necessary predicate to a second crime. In that case, an acquittal for the underlying predicate offense is afforded special weight. *See Commonwealth v. Magliocco*, 883 A.2d 479, 493 (Pa. 2005) (holding that where the jury found that the defendant did not commit the offense of terroristic threats, which was a predicate offense for the crime of ethnic intimidation, the conviction for ethnic intimidation could not stand); *see also Commonwealth v. Austin*, 906 A.2d 1213, 1220-22 (Pa. Super. 2006) (holding that the evidence was insufficient to find the defendant guilty of second-degree murder where the Commonwealth formally charged the defendant with robbery as the underlying predicate felony, and the jury specifically acquitted the defendant

of robbery); *compare Commonwealth v. Robinson*, 936 A.2d 107 (Pa. Super. 2007) (holding that an acquittal for theft does not preclude a conviction for robbery, because a theft need not be completed for a robbery to occur).

Patti argues that the jury's acquittal on all counts that involved driving precludes a conviction for involuntary manslaughter based on a determination that he was driving the vehicle at the time of the accident. According to Patti, the Commonwealth charged him with identical allegations for involuntary manslaughter and homicide by vehicle, but the jury acquitted him of homicide by vehicle. Patti maintains that these two verdicts are impossible to reconcile. Patti further argues that this case falls within the predicate offense exception because the Commonwealth charged Patti with committing involuntary manslaughter by violating the very same statutory elements and committing the very same conduct involved in the homicide by vehicle charge. Patti insists that the acquittals on other driving-related offenses, including homicide by vehicle and reckless driving, preclude a conviction for involuntary manslaughter based on the same charged conduct.

The trial court considered Patti's second issue and determined that it lacked merit. The court reasoned:

> In the current case, the jury considered all the testimony, evidence, and exhibits. The jury found [Patti] guilty of involuntary manslaughter. The two people in the vehicle that fateful night were [Patti] and the decedent . . .. One of them was driving when the vehicle was driven into a barrier in the construction zone and flipped. [The decedent] was ejected to his demise. It would be improper for this or any other court to guess as to the jury's factual findings, including if the jury found that [Patti] had been

- 16 -

the driver and dismissed other charges because they concluded that other elements of those charges were not met. For example, the jury may have dismissed the charge of homicide by vehicle while driving under the influence because it did not believe that [Patti] was intoxicated.

\* \* \* \*

Simply put, it is not for this court to usurp the power of the jury even in the face of alluding inconsistencies. We may not and will not speculate upon the nature of the jury's deliberations and factual findings as inconsistent verdicts are permissible. Therefore, it was appropriate for us to uphold the jury verdict and not grant an acquittal or alternatively, a new trial.

Trial Court Opinion, 1/23/24, at 13-14 (unnecessary capitalization omitted).

Based on our review, we find no basis to disturb Patti's conviction for involuntary manslaughter. To the extent Patti argues that his conviction cannot stand because he was acquitted of homicide by vehicle, he is entitled to no relief on this basis. First, the elements of the two crimes differ and evidence could be sufficient to establish one crime and not the other. To sustain a conviction for homicide by vehicle, the Commonwealth was required to prove that Patti caused the decedent's death by acting recklessly or with gross negligence, while violating a law or municipal ordinance under the conditions set forth in the statute. *See* 75 Pa.C.S.A. § 3732(a).[7] Thus,

_____

[7] Section 3732(a) of the Vehicle Code defines the offense of homicide by vehicle as follows:

[a]ny person who recklessly or with gross negligence causes the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the

*(Footnote Continued Next Page)*

homicide by vehicle requires proof that the death was caused by acting recklessly or with gross negligence while violating a law or municipal ordinance. *See id*. Involuntary manslaughter, on the other hand, does not require proof of violation of a Commonwealth law or municipal ordinance. *See* 18 Pa.C.S.A. § 2504(a). Indeed, as outlined above, a conviction for involuntary manslaughter can stand where the person caused the death of an individual while engaged in a lawful activity, but did so recklessly or in a grossly negligent manner. *See* 18 Pa.C.S.A. § 2504(a). Moreover, the crime of involuntary manslaughter does not require a finding that an individual was driving at the time of the offense. Accordingly, Patti's conviction for involuntary manslaughter is not inconsistent with an acquittal of homicide by vehicle.

For similar reasons, we additionally find no merit to Patti's claim that homicide by vehicle is predicate offense to the offense of involuntary manslaughter. The elements of the two crimes differ and can be established wholly independently of each other.[8]

_____

operation or use of a vehicle or to the regulation of traffic except section 3802 (relating to driving under influence of alcohol or controlled substance) is guilty of homicide by vehicle, a felony of the third degree, when the violation is the cause of death.

75 Pa.C.S.A. § 3732(a).

[8] While Patti summarily claims that the other offenses for which he was acquitted are also predicate offenses to involuntary manslaughter, he has
*(Footnote Continued Next Page)*

Finally, as explained above, the jury's decision to convict Patti of involuntary manslaughter but to acquit him of the remaining charges does not indicate that the jury was not wholly convinced of Patti's guilt as to those remaining charges. **_See Moore_**, 103 A.3d at 1246. Instead, the jury's decision to acquit Patti of the remaining charges may have been entirely due to leniency, a compromise among the jurors, or even a mistake. **_See id_**. Accordingly, Patti's second issue merits no relief.

In his third issue, Patti contends that the verdict was against the weight of the evidence. As our Supreme Court has explained:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

_____

provided no meaningful argument nor any legal support for this proposition. **_See_** Pa.R.A.P. 2119(a) (providing that each particular point raised by the appellant shall be supported by a discussion and citation of legal authorities as are deemed pertinent). Moreover, our independent research has revealed none. Thus, we decline to consider the issue further.

***Commonwealth v. Widmer***, 744 A.2d 745, 751-52 (Pa. 2000) (citations and footnote omitted). The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none, or some of the evidence and to determine the credibility of the witnesses. ***See Commonwealth v. Talbert***, 129 A.3d 536, 545 (Pa. Super. 2015). Thus, in order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court. ***Id***. at 546.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim ***is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence***. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted, emphasis in original).

Patti argues that the verdict was against the weight of the evidence because the Commonwealth's entire case depended on it being able to prove that Patti was the driver of the vehicle at the time of the accident. Patti points

out that, in acquitting Patti of the summary offenses, the trial court indicated that the Commonwealth failed to meet its burden of proving that Patti was the driver at the time of the accident. Patti also contends that the Commonwealth's expert, Corporal Palmer, had no training in determining where Patti and the decedent were sitting at the time of an accident, and had limited experience as an expert witness. Patti further claims that Corporal Palmer was unable to provide any sort of standard methodology for conducting this type of investigation, did not understand how the DNA evidence should factor into an accident investigation, and his opinion was based on an erroneous understanding of the DNA evidence, false claims about the location of the blood and biological material in the car, and a mistaken opinion that nothing had been moved before he inspected the vehicle. Patti argues that the testimony of the defense expert showed that there was no evidence whatsoever that Patti was driving the vehicle because the decedent's blood was on the driver's side, his DNA could not be excluded from the steering wheel sample, and no one saw who was driving. Patti asserts that, at a minimum, the defense proved that it was impossible to know who drove the vehicle.

The trial court considered Patti's third issue and determined that it lacked merit. The court reasoned:

> In the present case, the jury, in ruling on [Patti's] guilt or innocence in the charges, had the right to consider and believe all, part, or none of the evidence presented, as well as to determine the credibility of the witnesses. The jury concluded that [Patti]

was guilty of the charge of involuntary manslaughter and met the elements of the crime, which do not require him to be a driver. However, it is not known if the jury did in fact believe he was the driver for this charge, and did not convict him of other charges because other elements of those crimes were not believed.

\* \* \* \*

Both of these elements of involuntary manslaughter were clearly met in the current case. First, [Patti] had a suspended license and he had admitted to Officer Fenner that he had been drinking prior to the crash. Evidence was presented to show that [Patti] was the driver and that he had done so in a reckless or grossly negligent manner such that the vehicle was driven into a construction barrier ejecting and causing [the decedent's] demise. This evidence includes Mr. Riddle's testimony regarding his call with [the decedent] minutes before the accident occurred, and the testimony of Corporal Palmer as the Commonwealth's accident reconstructionist outlining evidence including blood splatter, likelihood of movement of [the decedent's] deceased body, and items found at the crash scene such as interior items and keys.

Secondly, the casual relationship of [Patti's] driving a [vehicle] owned by his family, resulted in [the decedent] being found deceased on November 26, 2016.

The jury's verdict meets the criteria of both sufficiency and weight of evidence. [Patti] has made no claim this court acted in a manner of partiality, prejudice, bias or ill will. Therefore, [the court] did not err in upholding the jury verdict and denying [Patti's] request for . . . a new trial.

Trial Court Opinion, 1/23/24, at 16-18 (citations to the record and unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion by the trial court in denying Patti's challenge to the weight of the evidence. As explained above, this Court will give the gravest consideration to the findings and reasons advanced by the trial court judge when reviewing its determination as to

- 22 -

whether the verdict is against the weight of the evidence. ***See Clay***, 64 A.3d at 1055. Moreover, one of the least assailable reasons for denying a new trial is the lower court's conviction that the verdict was not against the weight of the evidence. ***See id***.

Here, Patti's claim that the verdict was against the weight of the evidence is largely based on the lack of direct evidence that he was the driver. Patti essentially asks this Court to accord ***no*** weight to any of the evidence which indicates that he was the driver of the vehicle at the time of the accident and to instead give ***all*** weight to the evidence that the decedent was one of several individuals (including Patti) who touched the steering wheel. Patti also asks this Court to give ***no*** weight to Corporal Palmer's expert testimony. This we cannot do, as this Court may not reweigh the evidence. ***See Talbert***, 129 A.3d at 545 (holding that the weight to be accorded to the evidence and testimony presented at trial was exclusively for the jury, which was free to believe all, part, or none of the evidence and testimony and to determine credibility).

Rather, this Court's role is to review the exercise of discretion by the trial court in ruling on the weight claim. In this regard, we discern no abuse of such discretion. The trial court determined that, although the evidence was circumstantial, there was ample evidence from which the jury could reasonably infer that Patti was the driver of the vehicle at the time of the accident and that he did so in a reckless or grossly negligent manner so as to

case the decedent's death. Thus, as we discern no abuse of discretion by the trial court, Patti's third issue merits no relief.

In his fourth issue, Patti asserts that the trial court abused its discretion in qualifying Corporal Palmer as an expert in accident reconstruction and permitting him to provide expert testimony related to the accident. Preliminarily, we note that the admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. *See Commonwealth v. Le*, 208 A.3d 960, 970 (Pa. 2019). An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality. *See Commonwealth v. Talley*, 265 A.3d 485, 530 (Pa. 2021).

Pennsylvania Rule of Evidence 702 controls the admissibility of expert testimony on scientific knowledge, and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E.702. The standard for qualifying as an expert is a liberal one and the witness need only have "any reasonable pretension to specialized knowledge on the subject matter under investigation" and the weight to be given to the expert's testimony is for the factfinder. **Commonwealth v. Jones**, 240 A.3d 881, 890 (Pa. 2020) (citation and internal quotation omitted).

Patti concedes that Corporal Palmer had sufficient training and experience to qualify as an expert as to the cause of the accident. However, Patti contends that the trial court should not have permitted Corporal Palmer to testify as an expert as to who was driving the vehicle at the time of the accident. Patti argues that Corporal Palmer admitted that he had been asked to determine who had been driving a vehicle in only one other investigation, and he did not assert that his methodology for doing so was accepted by experts in the relevant scientific community. Patti claims that because Corporal Palmer lacked experience in making such a determination, the trial court abused its discretion by permitting him to testify as an expert in determining where Patti and the decedent were sitting at the time of the accident.

Patti devotes the rest of his argument to various criticisms of Corporal Palmer's testimony. Patti asserts that Corporal Palmer improperly considered the conversation between the decedent and Riddle which took place shortly before the accident, and maintains that only the jury should have been permitted to conclude what impact, if any, that phone call had on the question

of who was driving the vehicle. Patti additionally challenges Corporal Palmer's assumption that the accident scene and vehicle were in the same condition when he arrived as they would have been at the time of the accident. Patti points out that Corporal Palmer did not arrive at the accident scene until two hours after the accident and could not have known whether police officers moved things before he got there. Finally, Patti contends that although Corporal Palmer relied heavily on the fact that biological material from the decedent was detected on the windshield on the passenger side of the vehicle, Corporal Palmer concluded that the decedent had likely been ejected through the roof, and his blood was found on the driver's side roof panel which had also been flung from the vehicle.

The trial court, when ruling on Patti's pretrial motion, considered Patti's fourth issue and determined that it lacked merit. The court reasoned:

> First, a review of Officer Palmer's professional certificates establishes that his "scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson," and he is thus qualified as an expert for the purposes of Rule 702. Pa.R.E. 702(a). Officer Palmer has taken a plethora of courses and received many certificates relevant to accident reconstruction, some of which, like the mechanical safety inspector license, require periodic review. Second, Officer Palmer has testified as an expert in multiple cases and written reports similar to the ones at issue here.
>
> We now address the second criterion under Rule 702: whether "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Pa.R.E. 702(b). [Corporal] Palmer's testimony regarding accident reconstruction would assist the jury in understanding evidence introduced by the Commonwealth, specifically pertaining to the positioning of the driver and ejection

of [the decedent]. Such testimony would not usurp the jury's role, contrary to [Patti's] assertion, but would instead educate the jury on the physics of the collision. Thus, [Corporal] Palmer's proffered testimony meets the second standard per Rule 702, and he continues to qualify as an expert witness under the same.

Trial Court Opinion, 11/18/19, at 44 (some citations and unnecessary capitalization omitted).[9]

Based on our review, we discern no abuse of discretion by the trial court in qualifying Corporal Palmer as an expert in accident reconstruction. As the trial court explained, Corporal Palmer had received many certificates relevant to accident reconstruction and had testified as an accident reconstruction expert and prepared expert reports in multiple cases. Indeed, Patti concedes that Corporal Palmer had sufficient training and experience to qualify as an expert as to the cause of the accident. We additionally discern no abuse of discretion by the trial court with respect to its determination that Corporal Palmer's testimony regarding accident reconstruction would assist the jury in understanding evidence introduced by the Commonwealth regarding the positioning of the driver and ejection of the decedent.

Moreover, to the extent that Patti challenges certain conclusions reached by Corporal Palmer, such criticisms do not implicate his qualification

_____

[9] The trial court additionally determined that no *Frye* hearing was necessary because Corporal Palmer had used generally accepted scientific methodologies in arriving at his expert opinions. *See* Pa.R.E. 702(c). However, on appeal, Patti does not challenge the trial court's determination that no *Frye* hearing was required.

- 27 -

to testify as an expert, and instead implicate the weight to be accorded his opinions by the jury. *See Commonwealth v. Petroll*, 696 A.2d 817, 835 (Pa. Super. 1997) (holding that incorrect calculations in an expert's analysis did not disqualify him from providing expert testimony as it did not implicate his qualification to testify as an expert but rather went to the weight to be accorded his testimony, a matter to be determined by the jury). In this regard, once Corporal Palmer was qualified as an expert and provided his opinions, defense counsel was required to explore and expose any weaknesses in his opinions. *See In re D.Y*., 34 A.3d 177, 183 (Pa. Super. 2011) (holding that "[o]nce expert testimony has been admitted, the rules of evidence then place the full burden of exploration of facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination . . . to explore and expose any weaknesses in the underpinnings of the expert's opinion") (citations omitted). Thus, Patti's challenges to the specific conclusions reached by Corporal Palmer have no bearing on his qualification to testify as an expert in accident reconstruction. Accordingly, we conclude that Patti's fourth issue merits no relief.

In his final issue, Patti challenges the trial court's denial of his motion to suppress the statements he made to Officer Eilber at the police station. The standard of review an appellate court applies when considering an order denying a suppression motion is well-established. An appellate court may consider only the Commonwealth's evidence and so much of the evidence for

the defense as remains uncontradicted when read in the context of the record as a whole. *See Commonwealth v. Santiago*, 980 A.2d 659, 664 (Pa. Super. 2009). Where the record supports the factual findings of the suppression court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *See id*. However, an appellate court is not bound by the suppression court's conclusions of law. *Id*.

The warnings articulated in *Miranda* become mandatory whenever one is subjected to custodial interrogation. *See Commonwealth v. Brown*, 583 A.2d 805, 809-10 (Pa. Super. 1990). The United States Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Police detentions only become custodial when, "under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest." *Brown*, 583 A.2d at 810.

A law enforcement officer must administer *Miranda* warnings prior to custodial interrogation. *See Commonwealth v. Johnson*, 541 A.2d 332, 336 (Pa. Super. 1988). "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission." *Id*. (citation omitted). When a person's inculpatory statement is not made in response to custodial

interrogation, the statement is classified as gratuitous, and is not subject to suppression for lack of **Miranda** warnings. **Id**.

The trial court considered Patti's suppression challenge and determined that it lacked merit. The court reasoned that, although Patti was in custody after he revoked his consent for the blood draw and was taken to the police station while police obtained a warrant for his blood draw, he was not subjected to an interrogation and his comments to Officer Eilber were merely gratuitous. The trial court explained:

> . . . [Patti] came into custody at the hospital when he withdrew his consent, was taken against his will to a police station and made to wait in an interrogation room under supervision of an officer.

> Turning to the second prong of the **Miranda** test, [Patti] was not interrogated by Officer Eilber or any other police officer, but rather made statements spontaneously, and without being interrogated. Officer Eilber credibly summarized his interaction with [Patti] at the police station as follows:

> Q. While sitting and waiting with [Patti] for the completion of this search warrant, did you have any interaction with him?

> A. Just simple conversation mostly. [Patti] was basically speaking to me about what had happened. We were just having a normal conversation most of the time. I wasn't asking him anything in particular. It was just simple back and forth conversation.

> Q. Is this a conversation that he initiated engaging in?

> A. Yes, that's correct.

> Q. It was not in response to you questioning him?

> A. No, I wasn't asking him any leading questions about the crash or anything. He basically was telling me what had happened, and

he was trying to basically build up and plead his innocence towards me in the room.

Trial Court Opinion, 11/18/19, at 38-39 (some citations and unnecessary capitalization omitted) (*quoting* N.T., 7/2/19, at 54).

Based on our review, we conclude that the suppression court's ruling is supported by the record and free of error. As explained above, in reviewing a suppression ruling, this Court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *See Santiago*, 980 A.2d at 664. Here, the Commonwealth offered the testimony of Officer Eilber, who testified that he was directed to sit in a room with Patti and essentially just watch him to make sure that he did not leave while awaiting the search warrant for his blood draw. *See* N.T., 7/2/19, at 51. Officer Eilber explained that, while sitting in the room, "Patti was speaking about what had happened." *Id*. at 54. Officer Eilber indicated, "I wasn't asking him anything in particular." *Id*. The officer specifically clarified that Patti initiated the conversation that he was engaged in, not the officer. *Id*. Officer Eilber summarized the conversation as follows: "[Patti] basically was telling me what had happened, and he was trying to basically build up and plead his innocence toward me in the room." *Id*.

Notably, Patti did not testify at the suppression hearing and, thus, offered no testimonial evidence to refute Officer Eilber's version of events. Moreover, the suppression court credited Officer Eilber's testimony and made

a factual finding that that no custodial interrogation occurred, and that Patti's statements that his life was over and that it was all his fault were merely gratuitous. Because the record supports the factual findings of the suppression court, this Court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *See Santiago*, 980 A.2d at 664. As we discern no legal error, we conclude that although Patti was in custody at the Stroud Area Police Station, he was not subjected to police interrogation and, therefore, *Miranda* warnings were not required. Accordingly, Patti's final issue merits no relief.

In sum, as we find no merit to any of Patti's issues, we affirm the judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 4/8/2025